

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NOS. PD-1283-12, PD-1582-12, PD-1583-12

### ANDRES NAVA and XIOMARA MENDEZ, Appellants

### v.

### THE STATE OF TEXAS

### ON APPELLANTS' PETITIONS FOR DISCRETIONARY REVIEW
### FROM THE FOURTEENTH COURT OF APPEALS
### HARRIS COUNTY

KELLER, P.J., delivered the opinion of the Court in which MEYERS, PRICE, KEASLER and HERVEY, JJ., joined. COCHRAN, J., joined as to part II. COCHRAN, J., filed a concurring opinion in which ALCALA, J., joined. WOMACK and JOHNSON, JJ., concurred.

Nava and Mendez were each indicted for felony murder and organized criminal activity. Nava was sentenced to sixty years and seven years, respectively, on those charges, and Mendez was sentenced to sixty years and twenty years. We granted review to determine whether the appellants suffered egregious harm as a result of an error in the jury instructions on the law of parties and whether their appeals were prejudiced due to a missing portion of the voir dire record. Finding

against appellants on both issues, we affirm.

## I. JURY CHARGE – LAW OF PARTIES

### A. Background

### 1. *The Incident*

In June 2009, the Houston Police Department conducted undercover sting operations to identify and arrest individuals who were buying and reselling stolen goods. In one of these operations, Sergeant Robert Calderon, posing as someone wanting to sell stolen televisions, made contact with Mendez. Officer Henry Canales posed as the person delivering the televisions. Officer Canales wore a hidden microphone that recorded and transmitted audio to other officers. He drove a Budget rental truck containing over $30,000 worth of televisions and laptops to a Fiesta parking lot, the meeting place.

Mendez arrived at the parking lot in a van with Nava, Robert Carrillo, and a minor female. All discussions between Officer Canales and the conspirators took place in Spanish. Officer Canales discussed the price of the merchandise with the conspirators, and they eventually agreed to pay $6,500. But the conspirators were worried about whether the televisions would function. Officer Canales explained that he had no equipment with which to test the televisions but that they were new, stolen from the trucks that were transporting them. Eventually, it was agreed that the conspirators would pay Officer Canales up front, and then Officer Canales would accompany them to a location where the merchandise could be unloaded and tested.

After the conspirators paid for the televisions, Officer Canales said, in English, "It's a done deal." That phrase was meant to convey that money had exchanged hands, but a second phrase or act was expected to be the bust signal, which would alert the other officers to descend upon the

conspirators and arrest them. Carrillo began asking Officer Canales for the key to the Budget truck, while Officer Canales ignored the request and stalled for time. Again Officer Canales said in English, "It's a done deal," and again Carrillo asked about the key. Officer Canales's cellphone rang, and he answered, in English, "Go ahead." This may have been intended as the bust signal, but Sergeant Calderon did not hear it because he ended the phone call upon seeing Carrillo approach Officer Canales from behind. Carrillo approached with a pistol drawn and demanded the key. Officer Canales ran to the passenger side of the truck, muttering, "¡Ay buey!" Nava may have said, "¡Tírale!" ("Shoot him!"). Carrillo then said, "¿Traes las llaves? ¡Dame la feria o te mato, cabrón!" ("Do you have the keys? Give me the money or I'll kill you, asshole!"). Carrillo then shot Officer Canales in the back, and Officer Canales shot Carrillo in the chest. Officer Canales then said, in English, "It's a done deal. I'm shot." Both Officer Canales and Carrillo died from their injuries.

The remaining conspirators fled in the van. While Nava drove, Mendez called 9-1-1 because she thought that they were being pursued by a gang of thieves intent on murder. While the 9-1-1 operator was attempting to elicit Mendez's cell phone number, the police caught up with and stopped the van. As the police were ordering the conspirators to get on the ground, Mendez muttered, "I think they were undercover."

### 2. *Jury Charge*s

So that the reader may more easily understand how the jury charges were organized and appellants' complaint about them, we first set out the two statutory theories of party liability at issue in this case. The first theory of party liability, the more common "intent to promote or assist" theory, provides:

A person is criminally responsible for an offense committed by the conduct of

another if . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.[1]

The second theory of party liability, the "conspiracy" theory, provides:

 If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.[2]

As shown below, the abstract portion of appellants' jury charges included the exact language above

and correctly instructed the jury on both theories of party liability, as follows:

A person acts intentionally, or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result.

* * *

All persons are parties to an offense who are guilty of acting together in the commission of the offense.  A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both.

A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.  Mere presence alone will not constitute one a party to an offense.

If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually

---

[1]  TEX. PENAL CODE § 7.02(a)(2).  This case presents the unusual scenario in which the "intent to promote or assist" theory of party liability is alleged in conjunction with felony murder, an offense which lacks a culpable mental state with respect to causing death.  However, nothing in the Penal Code prohibits the State from using the law of parties in this fashion.  *See Mendez v. State*, 575 S.W.2d 36, 38 (Tex. Crim. App. 1979) (distinguishing prior case involving attempted involuntary manslaughter because, while a single individual cannot specifically intend a reckless act, one individual can intend to assist another in committing a reckless act).

[2]  TEX. PENAL CODE § 7.02(b).

committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

"Conspiracy" means an agreement between two or more persons with intent that they, or one or more of them, engage in conduct that would constitute the offense. An agreement constituting a conspiracy may be inferred from acts of the parties.[3]

The application paragraphs contained instructions on the law of parties for the charged offense of felony murder and for the lesser-included offenses of felony theft and attempted felony theft. The felony-murder instructions referred to both the "intent to promote or assist" and "conspiracy" theories of party liability:

Now, if you find from the evidence beyond a reasonable doubt that on or about June 23, 2009, in Harris County, Texas, [co-defendant] and/or Roberto Carrillo, did then and there unlawfully, intentionally or knowingly commit or attempt to commit felony theft, and while in the course of and furtherance of the commission or attempted commission of felony theft, Roberto Carrillo did commit an act clearly dangerous to human life, to wit: shooting H. Canales with a deadly weapon, namely, a firearm and did thereby cause the death of H. Canales, and that the defendant . . . with the intent to promote or assist the commission of *the offense*, if any, solicited, encouraged, directed, aided or attempted to aid [co-defendant] and/or Robert Carrillo to commit *the offense*; or

If you find from the evidence beyond a reasonable doubt that the defendant, [defendant], and [co-defendant] and/or Roberto Carrillo entered into an agreement to commit felony theft, and pursuant to that agreement, if any, they did carry out their conspiracy and that in Harris County, Texas, on or about June 23, 2009, while in the course of committing such theft, Roberto Carrillo committed an act clearly dangerous to human life that caused the death of H. Canales by shooting H. Canales with a deadly weapon, namely a firearm, and that the murder of H. Canales was committed in furtherance of the conspiracy and was an offense that the defendant should have

---

[3] The order in which these instructions were presented varies slightly between Mendez and Nava's cases. The instructions are outlined in the order presented in Mendez's case. The instructions for both defendants also provided that a person commits the offense of "murder" if "he commits or attempts to commit a felony other than manslaughter, and in the course of and in the furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual."

anticipated as a result of the conspiracy,

then you will find the defendant guilty of murder, as charged in the indictment.[4]

As will be discussed in more detail later, appellants' complaint focuses on the generic references in these instructions to "the offense" (italicized above). Their complaint is, in short, that the application portion of the charge misled the jury as to what offense, exactly, the defendant's intent had to be directed toward. The reference to "the offense" is ambiguous, and we will address the effect of this ambiguity in the analysis portion of our opinion.[5]

The lesser-included offense instructions included application paragraphs on liability as the primary actor and under the "intent to promote or assist" theory of the law of parties. The felony-theft instruction applying the law of parties provided:

> If you find from the evidence beyond a reasonable doubt that on or about June 23, 2009, in Harris County, Texas, [co-defendant] and/or Roberto Carrillo, did then and there unlawfully, with intent to deprive the owner of property hereinafter described, and believing said property was stolen by another, appropriate, by acquiring or otherwise exercising control over said property, to-wit: thirty four televisions and two computers of the value of at least $20,000 but less than $100,000, which property was in the custody of a law enforcement agency, namely, the Houston Police Department, and which property had been explicitly represented by H. Canales, a law enforcement agent, to [co-defendant] and/or Roberto Carrillo as being stolen, and that the defendant . . . with the intent to promote or assist the commission of the offense, if any, solicited, encouraged, directed, aided or attempted to aid [co-

---

[4] Emphasis added. "Defendant" and "co-defendant" refer to Nava and Mendez, or vice versa, depending upon whose case it is.

[5] This part of the jury charge would have been unambiguously correct if it had read as follows (changes from actual charge italicized):

> . . . defendant . . . with the intent to promote or assist the commission of the offense *of murder*, if any, solicited, encouraged, directed, aided or attempted to aid [co-defendant] and/or Robert Carrillo to commit the offense *of murder* . . . .

defendant] and/or Roberto Carrillo to commit the offense,[6] then you will find the defendant guilty of theft of property of the value of at least $20,000 but less than $100,000.

The law-of-parties application paragraph in the attempted-felony-theft instructions contained similar language. No objections were made to any of the jury instructions.

### 3. *Evidence and Argument*

In the opening portion of the State's closing argument, the prosecutor argued correctly the "intent to promote or assist" theory of party liability as it related to the offense of theft:

> A person is criminally responsible for an offense committed by the conduct of another if acting with the intent to promote or assist the commission of the offense he solicits, encourages, directs, aids or attempts to aid the other person to commit the offense. And just 'cause you're present mere presence alone will not constitute one a party to an offense. But what do you think is happening when Ms. Mendez tells Kleypas or what she thought Officer Canales was or she tells any person out there that's a thief, go out there and steal and I'll buy everything you have. I'll be the market for your theft. Is she acting with the intent that the crime of theft be committed. Well, of course she is. She doesn't benefit unless they're stealing something. Does she do something to solicit, encourage or aid the other person to go out and do the theft? Well, of course she is. She's telling you I'll be the market. I'll be the fence. You steal it and I'll fence it for you. Every time she does that and they go out and they do something like burglary or theft or whatever and they do it in reliance that she's going to be the fence they're guilty for what they do. So is she. So is anybody else that is working together with the intent that that crime be committed and they do something to encourage it to happen.

The prosecutor then discussed the "conspiracy" version of party liability as it related to the offense of felony murder.

Whether Nava said "tírale" was one of the hotly contested issues at trial. As will be shown, this fact lends support to a conclusion that the jury would have understood the jury instructions correctly. The word appears, and is attributed to Nava, in the incident-recording transcript made by Glenn Dodson. The defense proffered an alternate transcript made by Ana Paredes that does not

---

[6] Nava's jury charge adds at this point the phrase "if he did."

contain the word.    In listening to the incident recording, including a slowed-down version, we cannot definitively ascertain whether the word "tírale" was said.  In closing argument, the State pointed out that Dodson had transcribed and translated other Spanish-language recordings in the case and the defense viewed Dodson's work as "good enough for everything else."  The evidence shows that other records translated and transcribed by Dodson included the the 9-1-1 call made by Mendez and police interviews with Nava and Mendez.  It was the defense that introduced the 9-1-1 call and relied upon Dodson's translation at trial.

With respect to the alleged "tírale" remark, the prosecutor argued: "When Nava says shoot him there is no doubt [on] the first part of the Court's charge.  When you're acting with intent that the crime be committed and you do something to direct the other person to commit the offense you're guilty.  He's guity under both parts of the parties charge.  That is as clear as a bell."

One of Mendez's attorneys spent a significant amount of time arguing that "tírale" was not on the recording.  He claimed that the "State has found this magic word in this transcript" and that a more qualified and educated expert said that it was not there, that no Spanish-speaking officer had said it was, and that "it never came out until less than three weeks ago."  But, Mendez's attorney observed, even if the jury believed that the word was there, "Ms. Mendez didn't say that."  Mendez's attorney told the jurors that, to find her guilty, they either had to find "that she aided or encouraged or assisted Carrillo in *causing the death* of Officer Canales" or they had to find her guilty under the "conspiracy" theory of the law of parties.[7]

One of Nava's attorneys also argued that "tírale" was not on the recording and that the jury should believe the testimony of the qualified defense expert to that effect.  Nava's attorney

---

[7] Italics added.

acknowledged that, if the jury believed Nava said "tírale," the case was over for him: "That's why these lawyers want you to think that he said shoot him 'cause then it's over. If you think he said shoot him and you're convinced beyond a reasonable doubt that Ms. Paredes has lost her mind or whatever then find him guilty of murder. But if you're not convinced beyond a reasonable doubt then you got to do what the Judge tells you you have to do. You got to believe that he should have reasonably anticipated."

A different prosecutor spoke in the rebuttal argument. The rebuttal prosecutor argued that appellants were lying when they denied knowing that Carrillo had brought a gun with him. The prosecutor characterized the conspirators as "experienced crooks" and asked whether it made sense for them to take $6500 with them to meet people they did not know and "not take some protection?" He also pointed to evidence that Mendez habitually kept two guns in a linen closet and that a witness had seen Mendez holding a gun before.

The rebuttal prosecutor continued the earlier prosecution argument that "tírale" was on the recording and that Dodson's translation work was reliable:

> I didn't make up that word on the tape. It's been sitting there all along. It's just that no one had ever been asked to listen to it as closely as Glenn [Dodson] was. No one had ever used the tools and spent the time on it until Glenn did. And that's why I hired Glenn because his reputation was stellar, impeccable. These four [defense] lawyers over here have nothing bad to say about Glenn. Some of them have hired Glenn themselves. They know the quality of the work he does and they cannot criticize Glenn. They offered evidence that he had a huge hand in transcribing all the other recordings in this case. The only problem they have is with one line. One significant telling line.

Twice during closing argument, the prosecutor played the part of the tape where Dodson's transcript says "tírale" was uttered, and both times the prosecutor argued that the word was there. He also invited the jurors to listen to a slowed-down version of that part during their deliberations.

### 4. *Appeal*

On appeal, appellants argued that the instructions on the "intent to promote or assist" theory of party liability with respect to felony murder were erroneous because (1) the "intent to promote or assist" theory is not available for the offense of felony murder, and (2) the instructions given were ambiguous regarding whether the jury had to find an intent to promote or assist the felony murder or whether it merely had to find an intent to promote or assist the underlying theft. The court of appeals rejected the first claim, holding that the "intent to promote or assist" theory of party liability could apply to felony murder so long as the State proved an intent to promote or assist the underlying felony and also proved the intent to promote or assist an act that was unreasonably dangerous to human life.[8] However, the court agreed with appellants' second contention that the instructions were ambiguous because they "may refer solely to felony theft, not felony theft *and* the act clearly dangerous to human life."[9]

Because appellant did not object, the court of appeals addressed whether appellant was egregiously harmed by the error in the instructions.[10] The court first observed that the evidence was overwhelming or clear that appellants and Carrillo were criminally responsible for the underlying theft, that Carillo committed an act clearly dangerous to human life that caused the death of an individual, and that the shooting occurred in the course and futherance of the theft.[11] The court

---

[8]  *Nava*, 379 S.W.3d at 414-16.

[9]  *Id.* at 417 (emphasis in original).

[10]  *Id. See also Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (when defendant fails to object to erroneous jury instruction, reversal warranted only if defendant suffered "egregious harm").

[11]  Nava, 379 S.W.3d at 418.

subsequently explained that the parties fiercely contested whether appellants should have anticipated the shooting and whether Nava actually said "shoot him."[12] The court also explained that the language of the jury instructions was ambiguous: it "seemingly associate[d] accomplice responsibility with only felony theft" because of how it referred to the various actors, but the generic reference to "offense" meant that the jury could have construed the instructions to associate criminal responsibility with "the whole crime at issue, namely felony murder."[13]

Given the evidence and the arguments, however, the court of appeals held that it would have been unreasonable to construe the instruction as imposing responsibility for the murder solely on the basis of responsibility for the felony theft.[14] The court could not conclude that the jury "could avoid resolving the fiercely contested issues regarding appellants' 'anticipation' and whether Nava said 'Shoot him' because of a loophole in the jury charge."[15] The court held that, while "the erroneous instruction *theoretically* affected appellants' main defensive theory, *in actuality*, it is highly unlikely the jury convicted appellants of felony murder based solely on their involvement in the theft."[16]

## B. Analysis

### 1. *General Principles*

Because appellants did not object to the instructions at issue, they are not entitled to reversal

---

[12] *Id.* at 419.

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.* (emphasis in original).

unless the record shows that they suffered "egregious harm."[17] This is a difficult standard to meet and requires a showing that the defendants were deprived of a fair and impartial trial.[18] The record must disclose "actual rather than theoretical harm," and the error must have affected the very basis of the case, deprived the defendant of a valuable right, or vitally affected a defensive theory.[19] In determining whether egregious harm is shown, we look at the entire jury charge, the state of the evidence (including the contested issues and the weight of probative evidence), the arguments of counsel, and any other relevant information revealed by the record of the trial as a whole.[20]

## 2. *Jury Charge*

We begin with the fact that the abstract instruction on the "intent to promote or assist" theory of party liability was correct. It required the State to show that appellants intended to promote or assist the commission of felony murder before convicting of felony murder under this theory of party liability.[21] We disagree with the court of appeals's conclusion that, in a felony-murder prosecution, the "intent to promote or assist" theory of party liability requires only a showing that the defendants intended to promote or assist the underlying theft and the unreasonably dangerous act. The words "acting with intent to promote or assist the commission of the offense" clearly mean, at a minimum,

---

[17] *Vega v. State*, 394 S.W.3d 514, 521 (Tex. Crim. App. 2013).

[18] *Taylor v. State*, 332 S.W.3d 483, 489 (Tex. Crim. App. 2011).

[19] *Cosio v. State*, 353 S.W.3d 766, 777 (Tex. Crim. App. 2011).

[20] *Vega*, 394 S.W.3d at 521.

[21] *See Gelinas v. State*, 398 S.W.3d 703, 708 (Tex. Crim. App. 2013) (plurality op.) (proper recitation of the law in the abstract portion of the charge minimized the error in the application paragraph); *Vasquez v. State*, 389 S.W.3d 361, 371-72 (Tex. Crim. App. 2012) (correctness of the abstract portion of the charge showed, in combination with other factors, that any error in the application paragraph was harmless).

that a defendant must act intentionally with respect to the result elements of a result-oriented offense.[22] With some offenses, this may mean that State will have to show a greater culpable mental state for the accomplice than for the primary actor. Although in some instances this may seem strange, this interpretation is faithful to the language of both § 7.02(a)(2) and the felony murder

---

[22] *Kelly v. State*, 669 S.W.2d 720, 725 n.7 (Tex. Crim. App. 1984) (quoting portion of jury charge giving abstract instruction on the "intent to promote or assist" version of the law of parties and concluding, "In order to convict appellant then, the jury had to find that he solicited, encouraged, or directed another to kill Pryor, or that he aided or attempted to aid another in the killing of Pryor AND that he did so with the specific *intent* to promote or assist in the killing of Pryor") (capitalization and italics in original). *See also Tucker v. State*, 771 S.W.2d 523, 530 (Tex. Crim. App. 1988) ("before the accused may be found criminally responsible for the conduct of another who 'intentionally commits the murder,' under the provisions of V.T.C.A. Penal Code, § 7.02(a) (2), it must be shown the accused harbored a specific 'intent to promote or assist the commission of' the intentional murder the other committed. [citations omitted] One could hardly indulge an intent to promote or assist in the commission of an intentional murder without, at a minimum, intending or contemplating that lethal force would be used"); *Webb v. State*, 760 S.W.2d 263, 268-69 (Tex. Crim. App. 1988) (same); TEX. PENAL CODE § 6.03(a) (defining intent with respect to the nature of a defendant's conduct or the result of his conduct).

In *Flanagan v. State*, 675 S.W.2d 734, 740-41 (Tex. Crim. App. 1982), we concluded that similar language in the attempt statute required the actor to possess intent with respect to the result even if the object crime did not itself require intent with respect to the result:

> We initially note that § 15.01 plainly requires that a person act "with specific intent to *commit an offense*." (emphasis added) *Baldwin* attempts to construe that language to mean that a person may be convicted of an attempted offense when he acts "with the same intent required by the attempted offense." If that were the language of the statute, then it would follow that the intent necessary to support a conviction for attempted murder could be the same as that required by § 19.02(a)(2)—the intent to cause serious bodily injury. The statute, however, is not so worded. Indeed, § 15.01 defines the elements of criminal attempt in traditional terms. The element "with specific intent to commit an offense" has traditionally been interpreted to mean that the actor must have the intent to bring about the desired result, which in the case of attempted murder is the death of the individual. Thus, a specific intent to kill is a necessary element of attempted murder. The authorities in support of this interpretation are numerous and convincing.

*Id.* at 741 (emphasis in *Flanagan*).

statute. The State assumes this higher burden by pursuing an intent-based theory of party liability for a non-intent crime.[23] Combining the language of § 7.02(a)(2) with the felony murder statute, then, requires an intent to promote or assist, not only the commission of the underlying felony and the unreasonably dangerous act, but also the result of the offense of felony murder—the death of an individual. The abstract portion of the "intent to promote or assist" instructions in this case did this. It told the jury that, in order to find appellants guilty, it had to find that they intended the victim's death.

We next consider that the corresponding application paragraph was ambiguous. That application paragraph depicted a killing occurring in the course of a theft, but it described neither the theft nor the killing as an "offense" until the paragraph reached the "intent to promote or assist" language. At that point, the generic reference to "offense" would most likely be construed as referring to the offense depicted by the entire paragraph—felony murder—rather than the underlying theft offense that was only a part the application paragraph. On the other hand, the "intent to promote or assist" language referred to both Carrillo *and* the co-defendant. Because the jury was

---

[23] We have at least implicitly recognized that an accomplice can possess a greater culpable mental state than the principal. *See Ex parte Thompson*, 179 S.W.3d 549, 553 & n.9 (Tex. Crim. App. 2005) (stating, "It is well-established that one accomplice may be found guilty of a different, more serious offense than other accomplices," and citing cases for the proposition that an accomplice can be liable for a more serious offense than the principal); *id.* at 554 (stating, "What matters under Section 7.02(a) is the criminal *mens rea* of each accomplice; each may be convicted of only those crimes for which he had the requisite mental state," and quoting Professor LaFave for the proposition that "it is equally possible that the killer is guilty only of manslaughter because of his heat of passion but that the accomplice, aiding in a state of cool blood, is guilty of murder").

Moreover, if the legislature had wished to require proof that the accomplice possessed only the culpable mental state required by the crime itself, it could have said so, as it did in § 7.02(a)(1). *See* TEX. PENAL CODE § 7.02(a)(1) ("acting with the kind of culpability required for the offense, he causes or aids an innocent or nonresponsible person to engage in conduct prohibited by the definition of the offense").

instructed on Carrillo as the shooter, the reference to the co-defendant might imply that the offense at issue was the one committed directly by both Carrillo and the co-defendant—the theft. But this would be only an implication; nothing in the application paragraph expressly told the jury that guilt of felony murder could be established this way (i.e. with a defendant's intent being solely to promote or assist the commission of a theft), and the implication arising from the addition of the co-defendant's name is not a particularly clear one. The language of the application paragraph did not clearly direct the jury to deliberate in a way that is inconsistent with the law.[24]

Moreover, it goes against common sense to think that an intent to promote or assist the commission of felony theft was a sufficient mental state for felony murder under the "intent to promote or assist" theory of the law of parties when the conspiracy-liability provisions required more than that. The "conspiracy" portions of the jury charge required roughly the equivalent of intending to promote or assist the offense of theft and acting in accordance with such an intent—carrying out a conspiracy to commit felony theft—but they also required a finding that appellants "should have anticipated" the murder. Reading the charge in the erroneous manner that appellants suggest it could have been read would render the conspiracy portions of the charge superfluous. If the jurors really

---

[24] *See Mireles v. State*, 901 S.W.2d 458, 460-61 (Tex. Crim. App. 1995) (quoting and discussing *Boyde v. California*, 494 U.S. 370 (1990), for the proposition that, when a jury instruction is arguably ambiguous, the reviewing court should use "common sense" in its analysis in determining if there is a "reasonable likelihood" that the jury was misled by the ambiguity). *See also Gelinas*, 398 S.W.3d at 708 (that "clear error" existed in the application paragraph was a factor that weighed in favor of harm). A majority of the Court in *Gelinas* held that an error's obviousness to a jury can mitigate against its harmfulness. *Id.* at 709 (plurality op.), 712 (Cochran, J., concurring). Whether an instruction clearly directs a jury in error and whether it is obvious that the instruction is in error are two different things. An instruction may clearly give the jury the wrong law, but it may not be clear to a layperson that the instruction is wrong. Or, as in *Gelinas*, the instruction may clearly give the wrong law and also be obviously wrong to a layperson. In the present case, the instruction does not even clearly give the jury the wrong law.

interpreted the charge in the manner suggested by appellants, it would be left to wonder why the conspiracy portions were in the charge and why the law of conspiracy liability would contain the extra, unnecessary "anticipation" element. We may use common sense in assessing how the jury likely understood the charge, and common sense suggests that the jurors would not have read the charge in this way.[25]

In addition, the jury charge contained lesser-included offenses with associated application paragraphs that instructed on the "intent to promote or assist" theory of party liability. If the jurors understood the instructions as appellants suggest, then the only difference between the charged felony murder and the lesser-included offenses would be that someone died and Carrillo was the killer. Since those two facts were undisputed, the jurors might wonder why they were given the option to find appellants guilty of the lesser-included offenses. This is another factor suggesting that the jury would not have understood the charge in the manner proposed by appellants.

### 3. *Evidence and Argument*

The prosecutors never argued that appellants could be convicted of felony murder under the "intent to promote or assist" theory of party liability based solely on an intent to commit the theft. The first prosecutor argued the "intent to promote or assist" theory in connection with the theft offense, but that argument was understandable given that proving liability for the theft was part of proving liability for felony murder and because theft and attempted theft were submitted lesser-included offenses.

The centerpiece of the State's argument that Nava was liable under the "intent to promote

---

[25] *Id.* at 709-10 (plurality op.) (common sense), 712 (Cochran, J., concurring) (remarking about the obviousness of the error).

or assist" theory of the law of parties was the contention that Nava said "tírale." The first prosecutor made this clear when he said, "When Nava says shoot him there is no doubt [on] the first part of the Court's charge." Both prosecutors vigorously argued that Nava said "tírale" and that Dodson's transcription was trustworthy. The State made an enhanced version of the tape in an effort to show that. Nava's attorney argued that the prosecution had to prove that Nava said "tírale" in order to convict him under the "intent to promote or assist" theory of party liability. The closing prosecutor never disputed that assertion. Instead, he argued even more vigorously than the first prosecutor that Nava *did* say "tírale." Given this discussion, the jury almost certainly would have understood that the "intent to promote or assist" theory of liability was concerned with whether appellants intended to promote or assist the murder and not just whether they harbored an intent with respect to the theft. Otherwise, the dispute about whether Nava said "tírale" would have been pointless.

The prosecutors' arguments on conspiracy liability and whether appellants, and Mendez in particular, should have anticipated the killing were substantial. These arguments would have been unnecessary if the State simply had to prove, under the "intent to promote or assist" theory, that appellants intended the theft and Carrillo killed someone.

The prosecutors were obviously concerned with appellants' liability for theft because it was an element of felony murder and also of the organized crime charge. But large portions of the prosecutors' arguments would be completely unnecessary if the jury charge were understood in the manner suggested by appellants. This fact supports the conclusion that the jury understood the "intent to promote or assist" instructions in a manner consistent with the law instead of the manner suggested by appellants.

### 4. *The Factors Combined*

Given the jury charge as a whole, the evidence, and the arguments of the attorneys, we cannot conclude that the record demonstrates egregious harm. Although the felony-murder "intent to promote or assist" application paragraph is ambiguous and, in isolation, could potentially be understood in the manner appellants suggest, it could also be understood in a manner consistent with the law. Construing that paragraph in the manner appellants suggest would render large portions of the jury charge and the prosecutors' arguments superfluous. Viewing the charge as a whole, and from a common-sense perspective, and in the context of the rest of the trial, we conclude that the jury most likely understood the application paragraph in question in a manner consistent with the law.

## II. JURY SELECTION – MISSING RECORD

### A. Background

### 1. *Trial and Abatement Hearing*

This case was tried before Judge Mary Lou Keel. During voir dire, Judge Keel asked the venire, "Is there . . . anyone here who thinks that police officers always tell the truth or that all police officers will tell the truth?" Prospective juror five answered, "Under oath they do."[26]

Later, one of the defense attorneys asked whether, if the jury acquitted the defendants of felony murder but convicted them of the lesser-included offense of theft and the offense of organized criminal activity, the prospective jurors could consider the minimum range of punishment (two years) and probation. None of the prospective jurors were bothered by the minimum range of punishment, but several, including prospective juror thirty, said they could not consider probation.

---

[26] When defense counsel later asked whether any of the members of the venire had friends or relatives who work in law enforcement, prospective juror five answered: "I've worked for 6 years in Colorado at the sheriff's office. I also have my father-in-law and my brother-in-law are police officers in Casper, Wyoming and Chicago."

Specifically, prospective juror thirty said, "I wouldn't consider probation at all. I would not consider probation at all." Defense counsel replied, "I can't think of a set of facts within which you would be able to consider that?" Prospective juror thirty responded, "No. If they're breaking in and stealing why would I put them on the street to do it some more?"

The court reporter's record of jury selection ends with the notations "(Conclusion of Voir Dire). (Jury Seated)." The appellants filed a motion to abate the case because a portion of the voir-dire record was missing. The court of appeals abated the case for a hearing to determine (1) whether without the defendants' fault, significant portions of the record had been lost or destroyed; (2) whether the portions of the record were necessary to the defendants' appeals; and (3) whether the missing portions of the record could be replaced by agreement of the parties.

It was discovered that, because of a mechanical malfunction, the bench conference at which for-cause and peremptory challenges were made either was not recorded or could not be retrieved. It is undisputed that the failure to transcribe this bench conference was not the defense's fault.

Rudy Duarte, one of Nava's attorneys, testified that the two defense teams worked together on the challenges for cause. Most of the challenges were made by Bob Loper, one of Mendez's attorneys, but the challenges were adopted by Nava's attorneys. Consulting his notes, Duarte recalled that the defendants had challenged prospective juror thirty for cause for being unable to consider probation and that the challenge was denied. He could not remember whether other challenges for cause were made, and he had no notations for other challenges. He also could not remember whether any prospective jurors were called up to the bench for additional questioning. Duarte further testified that no *Batson* challenge was made.

Loper testified that he challenged for cause prospective jurors five, thirty, and forty-nine. His

notes indicated that he believed that prospective juror five was disqualified on the issue of police officer testimony, prospective juror thirty was disqualified for not being able to consider the entire range of punishment, and prospective juror forty-nine was disqualified on the issue of the presumption of innocence.[27] All three of these prospective jurors were peremptorily struck by the defense—a fact confirmed by strike sheets in the clerk's record. Loper further testified that the defendants exhausted their peremptory challenges, but he did not specifically remember any defense lawyer asking for additional peremptory challenges, and he did not specifically remember any defense lawyer objecting to a juror who actually sat on the jury.

Prosecutor Julian Ramirez did not have any notes or recollections about defense challenges for cause, but he testified that it was Judge Keel's practice to further question prospective jurors who were challenged for cause. Prosecutor Jim Leitner testified that he remembered feeling satisfied at trial that there were not any appellate issues on voir dire in the case.

During discussions after the testimony at the abatement hearing, Judge Keel and the defense agreed that the significance of the missing record was that it contained any rulings on defense challenges for cause, any steps taken to preserve error, and any further conversations with the prospective jurors. Judge Keel suggested that prospective jurors might have been rehabilitated while defense counsel suggested that a prospective juror "might have dug their hole deeper so to speak." Upon hearing defense counsel's suggestion, Judge Keel agreed that "we don't know" what took place with respect to prospective juror questioning.

---

[27] Loper was asked about prospective juror forty, who had a friend with the FBI, but, based on his notes, Loper "probably did not think" that prospective juror forty was challengeable for cause.

Over defense objection,[28] Judge Keel related her recollection of the hearing. She recalled that she denied only one defense challenge for cause and that was for prospective juror thirty. Her denial was based on the question to the prospective juror being an improper commitment question because the parties had "inject[ed] a dead body into a theft situation and asked the jury well if you've acquitted someone of murder and then convicted them of theft could you in an appropriate case consider probation." Judge Keel further stated that, despite her denying only one defense challenge for cause, the defense asked for two additional peremptory challenges. The judge further recounted that, when asked why they wanted two additional challenges, the defense attorney "made kind of a funny answer something like why not or what the heck and that was it." Judge Keel stated that the defense "did not go any further to preserve the error" and that she specifically remembered that because she was surprised by the failure to do so. "They did not identify somebody on the jury that they had to live with 'cause I was denying the strike, the additional peremptory strike," the judge recounted. The judge did not specifically remember whether she rehabilitated any of the prospective jurors who were challenged for cause, though that was her typical practice.

Judge Keel also made written findings of fact. Most of the findings favor the defendants, but the fourth finding is adverse: "The record is not necessary to the appeal since it memorialized no preserved error."

## 2. *Appeal*

The court of appeals held that the missing portion of the voir-dire record was not necessary

---

[28] The State requested that the trial judge "render her recollections" about the case "by either saying so or by way of Bill." The defense acknowledged that it could not stop the trial judge from "making a Bill" but objected "to the Court putting its recollection as testimony." This objection appears to relate to an earlier objection that, based on caselaw, defense counsel believed that the trial judge could use her recollection to correct an existing record but not to supplement a missing record.

to the resolution of the appeal because the trial judge had testified that the defendants never

identified an objectionable prospective juror that would sit on the jury:

> Appellants first argue the lost portion of the record is necessary to the resolution of
> their appeals because they are unable to determine whether the trial court erroneously
> denied a challenge for cause. However, during one of the abatement hearings, the
> trial court testified that appellants never identified an objectionable venireman who
> sat on the jury. The trial court obviously relied on this testimony when making its
> findings of fact because the court found the missing portion of the record
> memorialized "the failure of appellants to preserve error with respect to rulings on
> motions for cause." Neither appellant complains on appeal that the trial court erred
> by relying on its own testimony. Accordingly, the missing portion of the record is
> not necessary to the resolution of this issue because it has not been preserved for
> appeal.[29]

The court then responded to the defendants' claim that the missing portion of the record was

necessary to the resolution of a claim that counsel was ineffective for failing preserve error regarding

the challenges for cause.[30] After discussing our opinions in *Kirtley*[31] and *Routier*,[32] the court of

appeals concluded that the findings required to substantiate an ineffective-assistance claim in this

case would require impermissible speculation:

> Appellants argue the missing portion of the record *may* reveal that trial counsel,
> without a reasonable trial strategy, failed to identify to the trial court an objectionable
> venireman who said something which rendered him challengeable for cause when
> individually questioned at the bench and ultimately sat on the jury. Although
> conjecture may have been sufficient in *Kirtley*, it is not sufficient under *Routier*.[33]

**B. Analysis**

---

[29] *Nava v. State*, 379 S.W.3d 396, 412 (Tex. App.–Houston [14th Dist.] 2012).

[30] *Id.* at 412-13.

[31] *Kirtley v. State*, 56 S.W.3d 48 (Tex. Crim. App. 2001).

[32] *Routier v. State*, 112 S.W.3d 554 (Tex. Crim. App. 2003).

[33] *Nava*, 379 S.W.3d at 413 (emphasis in original).

### 1. *The Lost Record Rule*

Rule 34.6(f) provides for a new trial under the following conditions:[34]

(1) if the appellant has timely requested a reporter's record;

(2) if, without the appellant's fault, a significant exhibit or a significant portion of the court reporter's notes and records has been lost or destroyed or—if the proceedings were electronically recorded—a significant portion of the recording has been lost or destroyed or is inaudible;

(3) if the lost, destroyed, or inaudible portion of the reporter's record, or the lost or destroyed exhibit, is necessary to the appeal's resolution;  and

(4) if the lost, destroyed or inaudible portion of the reporter's record cannot be replaced by agreement of the parties, or the lost or destroyed exhibit cannot be replaced either by agreement of the parties or with a copy determined by the trial court to accurately duplicate with reasonable certainty the original exhibit.[35]

Only the third requirement is at issue in the present case.  Was the missing voir-dire bench conference necessary to the resolution of appellants' appeals?

### 2. *Voir Dire Error?*

The court of appeals held that it was not, based on the determination by the trial judge that the defendants never identified an objectionable person who sat on the jury.  Before harm can be shown from the denial of a challenge for cause, the defendant must (1) use a peremptory strike against the prospective juror upon whom the challenge for cause had been made, (2) exhaust his peremptory strikes, and (3) request an additional peremptory strike to use upon a specifically identified objectionable prospective juror, who, because the extra strike was denied, actually sits on

---

[34] TEX. R. APP. P. 34.6(f).

[35] *Id.*

the jury.[36] So, if we accept as true the proposition that the defendants failed to identify an objectionable prospective juror who would sit on the jury, then no error in denying a challenge for cause could be a basis for reversing the conviction, so the missing record would not be necessary to the resolution of the appeal.

What makes this case one of first impression is that the finding used to show that the missing record is not necessary to the appeal's resolution is based upon the trial judge's recollection of the proceeding for which the record is missing. May a trial judge rely upon her personal recollection of something that happened or did not happen in the unrecorded proceeding to establish that a record of that proceeding is not necessary to the resolution of the appeal?

In answering that question, we start with the standard of review for construing court rules. We attempt to effectuate the plain language of a rule unless there are important countervailing considerations.[37] Unlike the standard for construing statutes articulated in *Boykin v. State*,[38] the standard for construing court rules permits the consideration of extratextual factors even if the text

---

[36] *Davis v. State*, 313 S.W.3d 317, 343 (Tex. Crim. App. 2010). We have sometimes characterized these requirements as involving the preservation of error, *see e.g. Allen v. State*, 108 S.W.3d 281, 282 (Tex. Crim. App. 2003), but that characterization has fallen out of favor, and we generally say that these requirements are a predicate for showing harm. *Johnson v. State*, 43 S.W.3d 1, 5 n.6 (Tex. Crim. App. 2001) ("In the past we have confused preservation of error and harm issues within the context of an erroneous denial of a challenge for cause," and the listed requirements are a predicate for showing harm). *See also Hernandez v. State*, 390 S.W.3d 310, 316 (Tex. Crim. App. 2012) ("[b]efore harm can be shown . . . ."); *Davis*, 313 S.W.3d at 343. We agree with the court of appeals that Judge Keel's written finding that the defendants failed to preserve error was clearly referring to her statement that the defendants never identified an objectionable prospective juror who sat on the jury.

[37] *McQuarrie v. State*, 380 S.W.3d 145, 150 (Tex. Crim. App. 2012).

[38] 818 S.W.2d 782 (Tex. Crim. App. 1991).

of the rule is not ambiguous and does not lead to absurd results.[39] Extratextual factors include (but are not limited to) the object sought to be attained, common law or former provisions, and the consequences of a particular construction.[40]

Rule 34.6(f) has predecessors,[41] but its third requirement—that the lost record be necessary to the resolution of the appeal—is new.[42] The text of this portion of the rule does not explicitly address what matters may be considered in this type of inquiry.[43] The fourth requirement of the rule is that the lost record cannot be replaced by agreement of the parties, or if an exhibit, by agreement of the parties or by determination by the trial judge.[44] Within the context of the fourth requirement, then, a non-exhibit portion of the reporter's record can be replaced only if the parties agree. But there is a functional difference between the fourth requirement and the third requirement. The fourth requirement addresses whether the missing record *can* be replaced. The third requirement is not concerned with whether the missing record *can* be replaced but with whether the missing record *needs to* be replaced. If the missing record is determined not to be necessary to the appeal's resolution, then it does not need to be replaced.

---

[39] *McQuarrie*, 380 S.W.3d at 150; *White v. State*, 61 S.W.3d 424, 428 (Tex. Crim. App. 2001).

[40] *See Ex parte Rieck*, 144 S.W.3d 510, 512 (Tex. Crim. App. 2004).

[41] *Routier*, 112 S.W.3d at 570.

[42] *See Gomez v. State*, 962 S.W.2d 572, 574 (Tex. Crim. App. 1998) (quoting from former Rule 50(e), which does not contain the requirement that the missing record be necessary to the resolution of the appeal).

[43] *See* R. 34.6(f)(3).

[44] R. 34.6(f)(4).

The third requirement—that the missing record be necessary to the appeal—was meant to mitigate against the harshness of a rule that might require a new trial even when no error actually occurred in the proceedings. "The provision in the rule that the appellant show that the missing portion of the record is necessary to her appeal is itself a harm analysis."[45] When an appellant has not been harmed by the missing portion of the record, he should not be granted relief.

It is true that the point of having a record is to not have to rely upon the recollection of the trial judge or the parties. But when a trial judge's recollection is clear and shows that the missing portion of the record would not affect the appeal, the reason for the enactment of the third requirement becomes apparent. In assessing a trial judge's recollection, we should view the circumstances from the appellant's standpoint and resolve any reasonable doubt in his favor.[46] There are many situations in which one would not expect a trial judge to be able to recall what happened with the certainty and precision required to satisfy an appellate court—such as a blow-by-blow rendition of a witness's testimony or a prospective juror's responses. But in this case, we are confronted with a single discrete fact that a trial judge recalled with certainty and precision: whether the defense identified an objectionable person who actually sat on the jury. None of the attorneys contradicted the judge's recollection, and nothing in the record that actually is before us leads us to doubt that recollection. At least under these circumstances,[47] we hold that the court of appeals was correct to credit the trial judge's recollection as it related to the question of whether the missing

---

[45] *Routier*, 112 S.W.3d at 571.

[46] *See id.* at 570.

[47] We do not address whether we would have credited the trial judge's recollection if a defense attorney had testified to recalling that he did identify an objectionable juror.

record was necessary to the resolution of the appeal. Accordingly, the court of appeals correctly

determined that, because the defense attorneys did not identify an objectionable person who would

sit on the jury, the defendants had no viable appellate claim with respect to the denial of challenges

for cause.[48]

### 3. *Ineffective Assistance of Counsel?*

Appellant contends that he might still have had a viable claim of ineffective assistance of

counsel. For reasons somewhat different than those articulated by the court of appeals, we disagree.

Ineffective-assistance-of-counsel claims are governed by the familiar *Strickland* framework: To

prevail, the defendant must show that counsel's performance was deficient and that this deficient

---

[48] Judge Keel's recollection that the defense challenged only prospective juror 30 for cause might independently show that the missing record was not necessary to the resolution of the appeal. It would do so if Judge Keel were correct that the question of prospective juror 30 concerning probation for lesser offenses did not give rise to a challenge for cause because the question contained the extraneous fact that someone had died during the course of the offense. *See Standefer v. State*, 59 S.W.3d 177, 181-83 (Tex. Crim. App. 2001). But even if the question gave rise to a challenge for cause, we have held that the failure to allow a question about a punishment issue is harmless if events at trial cause the issue to be inapplicable to the defendant's case so that the jury had no occasion to deliberate on the issue. *See Taylor v. State*, 109 S.W.3d 443, 452-53 (Tex. Crim. App. 2003) (citing cases and holding that failure to allow questioning designed to discover jurors who could not consider minimum punishment for unenhanced offense was harmless when defendant pleaded true to enhancement paragraph). Although the offense of murder appears to have been eligible for jury-ordered probation at the time the offenses in this case were committed, the law was amended to prohibit jury-ordered probation before the appellants' trial began, and no savings clause appears in the amending act. *See* Acts 2009, 81st Leg., ch. 87, § 6.004 and *passim*, eff. Sept. 1, 2009. Regardless, the defense question required the jury to assume that the defendants were acquitted of murder, a contingency that did not occur. Also, arguably, the jury had no occasion to deliberate about probation in Mendez's case because it assessed sentences greater than ten years, the maximum for which probation was available. *See* TEX. CODE CRIM. PROC. art. 42.12 § 4(d)(1). However, one of the defense attorneys testified that he also challenged jurors 5 and 49 for cause, and the issue on which juror 5 would have been challenged relates to the guilt phase of trial. Due to our disposition above, we need not decide whether it would have been proper to credit Judge Keel's controverted recollection about who was challenged for cause.

performance prejudiced the defense.[49]  An attorney's performance is deficient if it is not within the range of competence demanded of attorneys in criminal cases as reflected by prevailing professional norms, and courts indulge in a strong presumption that counsel's conduct was *not* deficient.[50]  A defendant suffers prejudice if there is a reasonable probability that, absent the deficient performance, the outcome would have been different.[51]  A reasonable probability is a probability sufficient to undermine confidence in the outcome.[52]  It is a rare case in which the trial record will by itself be sufficient to demonstrate an ineffective-assistance claim.[53]  If trial counsel has not been afforded the opportunity to explain the reasons for his conduct, we will not find him to be deficient unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it."[54]

As part of an ineffective-assistance claim based upon an attorney's failure to identify an objectionable juror, a defendant would have to show who the objectionable juror was.  Because this issue is raised on direct appeal, any such showing would have to have been made in the trial court,[55] We have already accepted Judge Keel's statement that the attorneys did not identify an objectionable juror during the hearing, so we look to the rest of the record.  A review of the rest of the trial record

---

[49]  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

[50]  *Id.* at 689.

[51]  *Id.* at 694.

[52]  *Id.*

[53]  *Lopez v. State*, 343 S.W.3d 137, 143 (Tex. Crim. App. 2011).

[54]  *Menefield v. State*, 363 S.W.3d 591, 593 (Tex. Crim. App. 2012).

[55]  *See Davis v. State*, 227 S.W.3d 733, 737 (Tex. Crim. App. 2007)(Trial court was correct in declining to take judicial notice of defendant's exhibits because trial court had no opportunity to consider records and because documents "are not part of the appellate record.").

we have does not reveal an identified objectionable juror, nor why appellant's attorneys failed to identify one. No motion for new trial was filed, so there was no post-trial hearing at which the trial attorneys could have been questioned about the matter. There are many reasons why defense counsel might have refrained from identifying an objectionable juror. It could be that the defense attorneys were completely satisfied with the jurors who were selected. Or it could be that the prospective jurors immediately after the jurors that were selected were worse from the defense perspective.[56] Or it could be that counsel performed deficiently. The record is, of course, silent on this matter. Appellants are in the same position as anyone else whose claim on appeal is that their attorney was ineffective for failing to identify an objectionable juror. In such cases, the trial record will not usually be sufficient to support an ineffective assistance claim. Such is the case here. Appellants fail to show deficient performance.

### III. DISPOSITION

We affirm the judgment of the court of appeals.

Delivered: December 18, 2013
Publish

---

[56] *See State v. Morales*, 253 S.W.3d 686, 697-98 (Tex. Crim. App. 2008).