

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-20-00008-CR

———————————————————

ETHAN JAY CALLIHAN, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 235th District Court
Cooke County, Texas
Trial Court No. CR19-00775

Before Sudderth, C.J.; Wallach and Walker, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

## I. Introduction

Appellant Ethan Jay Callihan admitted in a recorded police interview that he had penetrated A.C.'s anus with his finger up to his middle knuckle and that he had penetrated A.C.'s anus with his penis, including the detail that he had worn a condom. Callihan said that it had happened one time in the living room of his parents' house, in the afternoon, "about a month before school let out," while A.C.'s two younger siblings were taking a nap. He told the investigators that he had tried to tell his parents but that it was hard to explain why he had done it. The interview was admitted into evidence and published to the jury.[1] Cooke County Sheriff's Office Investigator Jerry Crumley testified that when he had conducted Callihan's interview, he thought Callihan might have been a slow learner,[2] that he did not believe that Callihan had told him the whole truth, and that Callihan had tried to minimize what he had done.[3]

---

[1]The trial court overruled Callihan's counsel's objections to the admission into evidence of the recorded interview and to the trial court's allowing the jury to read a transcript of the recording during the recording's publication. Callihan does not challenge these rulings on appeal.

[2]Callihan dropped out of high school when he was a junior and had been working on his GED. He said that he had dropped out of high school because the school police had lied to him about not having seen anyone vandalize his vehicle.

[3]Callihan initially told the police that he did not know why A.C. would say that Callihan had put his penis inside A.C.'s anus because he had only inserted his finger, but over the course of the interview, he admitted that he had also inserted his penis.

Although Callihan insisted in the interview that it happened only once, A.C., who was in the sixth grade at the time of the trial, testified that it happened "[l]ike five" times between the time that he was in second and third grades[4] and that it happened in Callihan's bedroom after Callihan removed him from the top bunk in the bedroom that A.C. shared with his two younger siblings.

Callihan took the stand in his own defense and testified that he had told the police that he had done it so that he would be able to go home. He denied having assaulted A.C. or having wrongfully touched him in any way and said that it would have been impossible to pick A.C. up from the top bunk to take to his room because the bunk bed was taller than he was. Callihan said that he had never helped the children get ready for school by himself and that when he helped get them ready, he did so in the living room. During cross-examination, Callihan agreed that he had had problems with touching younger children in the past but did not recall which children. But he also said that what he told the police in 2015—that he had touched his niece, A.C.'s younger sister, and that while touching her, he kept telling himself "I don't need to be doing any of this"—was not true. Yet he agreed that he had said he needed counseling to help him not have such thoughts.

---

[4]A.C. was 12 years old at the time of the trial, and before allowing him to testify, the trial court determined that he was competent to testify by asking him if he understood the difference between the truth and a lie, by asking him if he understood that he had to tell the truth, and by asking him to promise to tell the truth.

3

A jury found Callihan guilty of having committed continuous sexual abuse of a child and assessed his punishment at 30 years' confinement. *See* Tex. Penal Code Ann. § 21.02(b) (stating that a person commits continuous sexual abuse of a child if, during a period that is 30 or more days in duration, he commits two or more acts of sexual abuse and at the time of the commission of each act of sexual abuse, the actor is 17 years of age or older and the victim is a child younger than 14 years of age), (h) (stating that the offense is a first-degree felony punishable by imprisonment of not more than 99 years or less than 25 years).

In a single point, Callihan appeals, arguing that he was denied effective assistance of counsel when his trial counsel failed to object to inadmissible extraneous offense evidence and that, but for trial counsel's deficient performance, the trial's outcome likely would have been different. We affirm.

## II.  Ineffective Assistance of Counsel

To establish ineffective assistance, an appellant must prove by a preponderance of the evidence that his counsel's representation was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Nava v. State*, 415 S.W.3d 289, 307 (Tex. Crim. App. 2013). We need not address both parts of the *Strickland* test if the appellant makes an insufficient showing on one component, nor do we need to address them in any particular order. *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069.

4

*Strickland*'s prejudice prong requires a showing that counsel's errors were so serious that they deprived the defendant of a fair trial—that is, a trial with a reliable result. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. In other words, an appellant must show a reasonable probability that the proceeding would have turned out differently without the deficient performance. *Id.* at 694, 104 S. Ct. at 2068; *Nava*, 415 S.W.3d at 308. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068; *Nava*, 415 S.W.3d at 308. We must ultimately focus on examining the fundamental fairness of the proceeding in which the result is being challenged. *Strickland*, 466 U.S. at 696, 104 S. Ct. at 2069. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.*, 104 S. Ct. at 2069.

In addition to the evidence set out in our introduction, the record reflected that A.C. and his younger siblings had lived with their relatives, Callihan and Callihan's parents, while their mother was in jail.[5] According to A.C., Callihan had bought them video games and toys and took care of them while Callihan's parents were at work, "[p]retty much every day except the weekends."

---

[5]A.C.'s mother said that she had been incarcerated in 2009 and again in 2015 related to her methamphetamine addiction. She was released on January 8, 2016. A.C. and his siblings were returned to her on May 29, 2017, at the end of the school year, after A.C. had run away when he heard Callihan's parents talking about letting CPS put them in foster care.

A.C. said that when he was in the second grade and third grade, Callihan would wake him before school and take him from the room that A.C. shared with his siblings into Callihan's room,[6] where Callihan would remove A.C.'s clothing and touch A.C.'s butt with his hand and his penis. A.C. said that Callihan had put his penis inside A.C.'s butt and performed a painful "humping motion" for 20 minutes or so, until it was time to get ready for school. A.C. did not tell anyone at the time because he was afraid of being placed into foster care. He told his mother a few months after he and his siblings were returned to her.[7] During cross-examination,

---

[6]During cross-examination, A.C. acknowledged that Callihan had lived in a separate trailer outside of the house for about a year before A.C. and his siblings were returned to their mother and that Callihan had never touched him when Callihan lived in the trailer. A.C. said that he slept on the top bunk in the room that he shared with his siblings and that Callihan would pick him up from the top bunk.

[7]A.C.'s mother testified that immediately before A.C. told her what had happened, she had heard A.C. and his siblings calling each other perverts and when she told them to stop because they did not know what it meant, A.C. told her that he knew exactly what it meant. A.C.'s mother said that A.C. had been embarrassed, scared, and upset when he told her what had happened and that after A.C. told her, she called her CPS caseworker. She said that A.C. was angry, shy, and embarrassed and that he had outbursts when forced to relive it by talking about it. She blamed herself, stating, "[I]f I wouldn't have been a drug addict, they would have never been placed with another family, they would have never had to go through this . . . it was my fault that they were there and, therefore, it was my fault that it happened." During cross-examination, A.C.'s mother said that A.C. had been on an in-school suspension at the time of the trial because he had had an outburst at school.

A.C.'s mother did not testify about the contents of A.C.'s outcry to her. Instead, a forensic interviewer testified that she had interviewed the nervous and reluctant then-nine-year-old child in September 2017 and that he told her that "[Callihan had] humped him and stuck his privates in his butt" in April or May that year and indicated that it had happened more than once.

A.C. and his mother denied that she and A.C.'s grandmother had told him and his siblings that if they wanted to be returned to their mother, they had to say that Callihan had done something wrong to them.

A.C. told the forensic examiner that Callihan had assaulted him more than once. He told the sexual assault nurse examiner (SANE nurse), who conducted an exam of him in September 2017, that Callihan "stuck [his] private in [A.C.'s] butt hole. It hurt really bad. He went back and forth for about 30 minutes. It happened about three different times. The last time was about a month before school was out."[8] A.C. told the SANE nurse that after Callihan finished, he told A.C. to get ready for school.

The extraneous offense evidence referred to by Callihan is that, during his recorded interview, he was asked about a 2015 allegation by A.C.'s younger sister against him and about his having told officers during that 2015 investigation, "I don't know why I touched her, I know it was wrong, but I just couldn't stop myself." The prosecutor then impeached each of Callihan's four defense witnesses by asking if they knew that Callihan had admitted to having a problem doing inappropriate things to younger people.

Tommy Rains, who had twin 13-year-old daughters, testified that he had known Callihan for at least seven years, that in 2016, Callihan had occasionally

---

[8]The SANE nurse testified that A.C. had been very tense during her review of the rectal area and that it appeared to her that "there probably was a scar" but she could not say for sure because he could not relax enough for her to visualize it, so she had noted, "Unable to positively identify any areas of scarring."

babysat for him, and that his daughters had never made any reports that Callihan had bothered them. On cross-examination, Rains initially agreed that he had known in 2015 that Callihan had been accused of a sexual offense against a child but still let his daughters go around with him but then he said that the only accusation he knew about was A.C.'s 2017 accusation and had not known its details. Rains said that if Callihan had admitted to putting his penis in A.C.'s anus that would concern him.

Randy Chapman testified that Callihan had been his employee since September 2018, when Chapman purchased the company where Callihan worked. Chapman said that Callihan had always been honest with him "as far as [Chapman] knew" and that he had never had a problem with him. On cross-examination, Chapman said that Callihan had been around Chapman's 14-year-old son and that he was not concerned about Callihan's admitting to having put his penis into A.C.'s butt because he did not believe it was true.

Callihan's stepfather testified that he had raised Callihan since he was five years old and that Callihan had been diagnosed with severe attention deficit disorder and could not remember to do things without a list. He testified that in 2015, A.C.'s younger sister J.C. had alleged that Callihan had touched her but that nothing had come of her allegation after he ordered Callihan to turn himself in to the sheriff's department. Callihan's stepfather also related that he thought the children had been coached into making the allegations. On cross-examination, he said that his work hours during that time had been from 6 a.m. to 3:30 p.m. He also said that he was

8

sure Callihan had been alone with the children before J.C.'s 2015 allegation and that Callihan had helped take care of them up until then but that after J.C.'s 2015 allegation, he and his wife had never left Callihan alone with the children and that they had set up the separate trailer outside for Callihan to sleep in after J.C.'s allegation.

Callihan's mother testified that she and her husband had taken care of A.C. and his siblings off and on for seven years. She said that A.C. had been constantly in trouble at school for fighting, bullying, and lying and that she believed the children had been coached by their mother and grandmother into making accusations against Callihan. She said that she did not believe that Callihan had done anything to A.C. and stated, "If you can prove it to me, I would believe it, but I know him, and I know the situation, and I do not believe that he's done this."

Assuming, for the sake of argument, that defense counsel provided ineffective assistance by failing to challenge the complained-of extraneous offense evidence, in light of Callihan's admissions during his interview and the jury's ability to judge his demeanor and credibility both during the interview and during his testimony at trial—as well as the jury's ability to judge A.C.'s demeanor and credibility during his trial testimony—we cannot say that Callihan has shown a reasonable probability that the outcome would have been different without the allegedly deficient performance. That is, based on Callihan's interview and testimony, A.C.'s testimony, and the SANE nurse's testimony, the jury could have found that Callihan had sexually assaulted A.C. three to five times over the course of at least a year regardless of the extraneous

9

offense evidence, eliminating the reasonable probability that the proceeding would have turned out differently without the alleged deficient performance.[9] *See Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068; *Nava*, 415 S.W.3d at 308. Accordingly, we overrule his sole point.

## III. Conclusion

Having overruled Callihan's sole point, we affirm the trial court's judgment.

/s/ Bonnie Sudderth
Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: March 4, 2021

---

[9]Callihan was 29 years old at the time of the trial. The minimum sentence he could have received was 25 years' confinement. *See* Tex. Penal Code Ann. § 21.02(h). The jury assessed his punishment at 30 years' confinement, notwithstanding the prosecutor's argument that Callihan was a monster and that the jury should send a message that said "we don't ever want him back in our community, because this is what he does to children."