

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00282-CR

_____

EDWIN CAMILLO VALENCIA, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 371st District Court
Tarrant County, Texas
Trial Court No. 1711401D

---

Before Birdwell, Bassel, and Walker, JJ.
Memorandum Opinion by Justice Walker

## MEMORANDUM OPINION

Appellant Edwin Camillo Valencia appeals his conviction for stalking and raises one jury-charge issue. We affirm the trial court's judgment.

### I. BACKGROUND

Valencia and Jane[1] met while teaching at the same public school. Initially, they had a professional relationship. Three years later, Valencia's behavior changed.

Despite teaching a different grade in another part of the school, Valencia began visiting Jane's classroom more frequently and watching her through her classroom's window. He also began messaging and calling Jane on Facebook more frequently, gave her personal gifts, and sent a student to deliver a romantic poem to her. Jane confronted Valencia regarding his behavior, and he confessed his love for her. She rebuffed him, and he stopped contacting her for a while. Two weeks later, he approached her in the school parking lot with a bottle of hand lotion as a gift, asking, "I've been a good boy, haven't I?" Jane reported Valencia's behavior to the school principal, and the school district investigated the allegations and asked Valencia to resign.

Approximately nine months later, Valencia called Jane, who responded, "Leave me alone. Do not call me." Two months later, Valencia came to Jane's house uninvited.

---

[1]Although the complainant was an adult, we nonetheless use a pseudonym to protect her privacy. *See* Tex. Const. art. I, § 30(a)(1); 2d Tex. App. (Fort Worth) Loc. R. 7.

Jane's husband, who was at the grocery store with their child, called the police and rushed home. Upon arriving, Jane's husband confronted Valencia and prevented him from leaving until police arrived. Valencia was released with a criminal trespass warning but was later arrested and charged with stalking.

After the guilt–innocence phase of trial, the trial court prepared a jury charge. Although the charge included the stalking statute's three elements, it erroneously used a disjunctive connector between the first and second elements. The application paragraph contained the same error. Valencia did not object to this error. The jury found him guilty of stalking and assessed punishment at five years' confinement. The trial court sentenced Valencia accordingly.

## II. DISCUSSION

In one issue, Valencia contends the erroneous jury charge violated his due-process rights by permitting the jury to find guilt on less than all required elements of the offense.

We must review "all alleged jury-charge error . . . regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). In reviewing a jury charge, we first determine whether error occurred; if not, our analysis ends. *Id.*

A person commits the offense of stalking if he knowingly engages in a "scheme or course of conduct" that

3

(1) constitutes an offense under Section 42.07 [harassment],[2] or that the actor knows or reasonably should know the other person will regard as threatening:
    (A) bodily injury or death for the other person;
    (B) bodily injury or death for a member of the other person's family or household or for an individual with whom the other person has a dating relationship; or
    (C) that an offense will be committed against the other person's property;

(2) causes the other person, a member of the other person's family or household, or an individual with whom the other person has a dating relationship to be placed in fear of bodily injury or death or in fear that an offense will be committed against the other person's property, or to feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended; and

(3) would cause a reasonable person to:
    (A) fear bodily injury or death for himself or herself;
    (B) fear bodily injury or death for a member of the person's family or household or for an individual with whom the person has a dating relationship;
    (C) fear that an offense will be committed against the person's property; or
    (D) feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended.

---

[2]Relevant to the jury charge at issue, Section 42.07 defines harassment as acting "with intent to harass, annoy, alarm, abuse, torment, or embarrass another" by "threaten[ing], in a manner reasonably likely to alarm the person receiving the threat, to inflict bodily injury on the person or to commit a felony against the person, a member of the person's family or household, or the person's property" or "send[ing] repeated electronic communications in a manner reasonably likely to harass, annoy, alarm, abuse, torment, embarrass, or offend another." Tex. Penal Code Ann. § 42.07(a)(1), (7).

Tex. Penal Code Ann. § 42.072(a). The trial court's jury charge rephrased this definition

and added a disjunctive connector between the first and second elements. Specifically,

the jury charge stated,

> Our law provides that a person commits the offense of **stalking** if on more than one occasion and pursuant to the same scheme or course of conduct that is directed specifically at another person he knowingly engages in conduct that:
>
> Constitutes harassment, or conduct that the actor knew or reasonably should have known the other person would regard as threatening bodily injury or death for the other person, threatening bodily injury or death for a member of the other person's family, household, or someone with whom the other person has a dating relationship, or threatening that an offense will be committed against the other person's property;
>
> *Or* he knowingly engages in conduct that causes the other person, a member of the other person's family or household, or an individual with whom the other person has a dating relationship to be placed in fear of bodily injury or death, or in fear that an offense will be committed against the other person's property, or causes the other person to feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended;
>
> And said conduct would cause a reasonable person to fear bodily injury or death, fear bodily injury or death for a member of the person's family or household, or for an individual with whom the person has a dating relationship, or fear that an offense will be committed against the person's property; or feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended. [Emphasis added.]

The charge defined harassment:

> [A] person commits the offense of **harassment** if, with intent to harass annoy, alarm, abuse torment, or embarrass another he:
>
> threatens in a manner reasonably likely to alarm the person receiving the threat, to inflict bodily injury on the person or commit a felony against the person, a member of the person's family or household, or the person's property;

5

> Or sends repeated electronic communications in a manner reasonably likely to harass, annoy alarm, abuse, torment, embarrass, or offend another.

The charge's application paragraph contained the same disjunctive connector as the abstract. Valencia contends that the addition of the disjunctive connector meant that guilt could be found on less than all three elements. The State agrees, as do we.

Valencia, however, did not object to this error below, so we review the error for egregious harm. *See Nava v. State*, 415 S.W.3d 289, 298 (Tex. Crim. App. 2013); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); Tex. Code Crim. Proc. Ann. art. 36.19. The appropriate inquiry for egregious harm is fact- and case-specific. *Gelinas v. State*, 398 S.W.3d 703, 710 (Tex. Crim. App. 2013); *Taylor v. State*, 332 S.W.3d 483, 489 (Tex. Crim. App. 2011).

In making an egregious-harm determination, we must consider "the actual degree of harm . . . in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel[,] and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171; *see generally Gelinas*, 398 S.W.3d at 708–10 (applying *Almanza*). Errors that result in egregious harm are those "that affect the very basis of the case, deprive the defendant of a valuable right, vitally affect the defensive theory, or make a case for conviction clearly and significantly more persuasive." *Taylor*, 332 S.W.3d at 490 (citing

6

*Almanza*, 686 S.W.2d at 172).  The purpose of this review is to illuminate the actual, not just theoretical, harm to the accused.  *Almanza*, 686 S.W.2d at 174.

## A.  FACTOR ONE—THE ENTIRETY OF THE JURY CHARGE

Mere error in a jury charge is not sufficient alone to meet the first *Almanza* factor. *French v. State*, 563 S.W.3d 228, 236 (Tex. Crim. App. 2018).  Thus, we must consider "whether anything in the balance of the jury charge either exacerbated or ameliorated" the error.  *Id.*  Here, both the abstract and application sections of the jury charge contained the same error.  Thus, the jury charge both misstated the law and instructed the jury to apply this misstatement.  Accordingly, this factor weighs in favor of finding harm.  *See id.*[3]

## B.  FACTOR TWO—THE STATE OF THE EVIDENCE

Valencia admits on appeal that there was ample evidence to support his conviction.  Yet he asserts that the charge permitted the jury to disagree about whether the evidence supported the first or the second element of the offense.  The record

---

[3]Citing our opinion in *Alkayyali v. State*, 668 S.W.3d 445, 455 (Tex. App.—Fort Worth 2023, pet. filed), Valencia contends that courts routinely reverse judgments on unpreserved jury charge errors in circumstances like those at issue here.  The jury charge in *Alkayyali* omitted cause of death as an element.  *Id.* at 453–54. Cause of death was a "hotly contested" fact issue and the chief defense.  *Id.* at 454.  The jury charge at issue here did not omit an element of the offense but misstated the relationship between the elements, and the record does not reflect a similar "hotly contested" fact issue. Regardless, we did not conclude there was egregious harm in *Alkayyali* based solely on the omission, but we applied the *Almanza* factors, *id.* at 453–55, as we do here.

7

reflects, however, substantial evidence that could reasonably support a finding against Valencia on both the first and second elements.

The record reflects that Valencia and Jane's professional relationship changed in the fall of 2020. Specifically, Valencia began visiting Jane's classroom more frequently with no professional reason for doing so and started giving her inappropriate romantic gifts. Valencia also started watching Jane through a window into her classroom. Jane testified that she would sometimes stand in the back of the classroom or turn off the lights so that Valencia could not see her through the window. When Jane told him to stop bringing gifts, he would have his kindergarten students deliver them.

Valencia and Jane's Facebook relationship also changed in the fall of 2020, when he started sending Facebook messages more frequently and began calling Jane late at night. His messages also became possessive and sexual in nature, and some messages concerned Jane's two-year-old child. Valencia explained that the many calls were accidental, but Jane responded that accidental calls were not possible on Facebook. Jane told Valencia to stop contacting her via Facebook and blocked him when he did not stop.

In November 2020, Valencia sent a kindergarten student to deliver a poem to Jane. The poem was a romantic acrostic using the letters of Jane's name. Jane returned the poem and informed Valencia that it was inappropriate. Shortly thereafter, Jane confronted Valencia in-person about his behavior. She testified that she was scared to meet with him, so she had her co-teacher stay close by for support. She told Valencia

8

that she would have to report his behavior to the school principal if he did not leave her alone. Valencia confessed that he loved her, and she told him that she had not given him any reason to feel that way.

After their discussion, Jane avoided Valencia, who still came to Jane's classroom looking for her. Two weeks later, Valencia approached Jane in the school parking lot. He drove up to her vehicle as she was leaving and asked, "I've been a good boy, haven't I?" He then offered her a gift of hand lotion. Jane testified that she rejected the gift and was "[s]cared that he was never going to stop." She also told her co-teacher that she did not know what to do, and that she did not want to go to work anymore.

When she came back to school from winter break, she reported Valencia's behavior to the school principal. The school district investigated Jane's allegations, found grounds for termination, and reached an agreement allowing Valencia to resign. Valencia was interviewed by the school district's investigator and submitted a written statement in which he stated that he understood that he was not to approach Jane and promised not to do so.

Despite this promise, Valencia called Jane in September 2021. Jane was at a school open house when she received the call. She thought it might be a student's parent and was "shocked" when she heard Valencia's voice. He asked how she was doing, and Jane responded, "Leave me alone. Do not call me." Although Jane had previously given Valencia her phone number, she changed it in the spring or summer of 2021.

Valencia then showed up uninvited at Jane's house on November 18, 2021. Jane's husband and child were at the grocery store, so Jane texted her husband to say that Valencia was ringing the doorbell. Jane testified that she panicked when she saw Valencia through the peep hole, that she was crying and scared, and that she found a kitchen knife to protect herself. Jane's husband called the police and rushed home. Valencia was still at the residence when Jane's husband arrived. He blocked Valencia's vehicle from leaving and called the police again. Police arrived and interviewed Valencia, Jane, and her husband. Valencia told the police that he was "on break" or "casually driving" and decided to drop off a gift for Jane's child. Valencia also acknowledged that he had been told not to contact Jane and offered, "You know that I had stopped for a little while." Police issued a criminal trespass warning to Valencia and notified him that he would be investigated for stalking.

Jane testified that she felt harassed, alarmed, and annoyed by Valencia's phone calls, Facebook messages, gifts, and presence at her classroom. She also testified that she felt threatened when Valencia showed up at her house.

On this evidence, a jury could reasonably have found that Valencia's behavior met all three elements of the offense. *See* Tex. Penal Code Ann. § 42.072(a). Specifically, evidence of Valencia's persistent unwelcome conduct toward Jane despite multiple warnings to stop is sufficient to satisfy both the first and third elements, which incorporate an objective standard concerning whether a person would feel harassed, alarmed, or threatened by the conduct at issue. *See id.* § 42.07(a)(2) (requiring threats

10

"reasonably likely" to alarm the recipient), § 42.07(a)(7) (requiring repeated electronic communications "reasonably likely to harass, annoy, alarm, torment, embarrass, or offend another"), § 42.072(a)(1) (incorporating Section 42.07), § 42.072(a)(3) (requiring conduct that would cause a "reasonable person" to fear bodily injury or "feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended"). The evidence is also sufficient for a jury to reasonably find that Jane was placed in fear or felt harassed by Valencia's behavior. *See id.* § 42.072(a)(2). Accordingly, the evidence does not weigh in favor of finding egregious harm.

### C. FACTOR THREE—ARGUMENT OF COUNSEL

Valencia asserts that the State addressed the first two elements in its closing argument, but that it did not emphasize that they both had to be met. We disagree.

In both their opening statements and closing arguments, both sides primarily addressed evidence regarding the first two elements. This is unsurprising since these elements concern the defendant's behavior and the victim's response. *See id.* § 42.072(a)(1), (2). Twice in closing, however, counsel for each side properly enumerated the elements of the offense. Specifically, after outlining the evidence supporting the State's allegations, the prosecutor quoted the statute, stating,

> The Defendant knew or should reasonably have known that the other person would regard such conduct as threatening bodily injury or death *and* such conduct did cause the other person to be placed in fear of bodily injury or death or did cause the other person to feel harassed, annoyed, alarmed, abused, or tormented.
>
> . . . .

11

And such conduct would cause a reasonable person to fear bodily injury or death to herself or, again, feel harassed, annoyed, alarmed, abused, or tormented. [Emphasis added.]

Valencia's counsel also presented the elements in the form of questions: "First, what was [Valencia's] intent? Two, did something actually happen? And, three, how did [sic] a reasonable person feel?" These restatements and characterizations of the offense weigh against finding egregious harm.

## D. FACTOR FOUR—TRIAL AS A WHOLE

Other relevant information in the record reflects that the jury was advised of the offense's elements. During voir dire, the prosecutor displayed and discussed the elements.

> What is stalking? There are elements that the State has to prove beyond a reasonable doubt. . . . [I]t starts like this: The defendant, on or about a certain date, did knowingly engage in conduct on more than one occasion and pursuant to the same scheme or course of conduct that was directed at another person and -- here is your first way -- such conduct constitutes harassment.
>
> . . . .
>
> So we see here harassment is one way. All of it is pretty common sense. Or the defendant knew or should reasonably have known that the other person would regard the conduct as threatening bodily injury or death *and* such conduct did cause the other person to be placed in fear of bodily injury or death or did cause the other person to feel harassed, annoyed, alarmed, abused, or tormented.[4] [Emphasis added.]

---

[4]The prosecutor's synopsis condensed aspects of the first two stalking elements, joining them with a conjunctive connector. The prosecutor specifically highlighted the elements requiring harassment under Section 42.07 or conduct that the actor knows or reasonably should know the other person will regard as threatening bodily injury or

12

The prosecutor further explained, "Step one, it's either harassment or the defendant should have known what was going to happen; step two, it actually did happen; and then, step three, a reasonable person would have known the effect would happen." After presenting several hypothetical scenarios and soliciting analyses from the venire panel members, the prosecutor reiterated that stalking requires "[m]ore than once, same scheme or course of conduct, similar behavior, the victim feared bodily injury, the victim felt alarmed, and a reasonable person would feel alarmed." Thus, from the outset, the State identified the three elements of the offense.

Having examined the four *Almanza* factors, we conclude that the erroneous jury charge did not deprive Valencia of a valuable right, vitally affect his defensive theory, or make the case for conviction clearly and significantly more persuasive. *See Taylor*, 332 S.W.3d at 490; *Almanza*, 686 S.W.2d at 171. Thus, Valencia did not suffer egregious harm.

### III. CONCLUSION

Having concluded that the error in the jury charge did not result in egregious harm, we overrule Valencia's sole issue on appeal and affirm the trial court's judgment.

---

death *and* that such conduct caused the other person to have such fear or to feel "harassed, annoyed, alarmed, abused, [or] tormented." Tex. Penal Code Ann. § 42.072(a)(1), (2).

13

/s/ Brian Walker

Brian Walker
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  August 10, 2023