

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-24-00052-CR
_____

HARRY THEODORE LEVINE, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 355th District Court
Hood County, Texas
Trial Court No. CR15647

Before Sudderth, C.J.; Bassel and Wallach, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I. Introduction

Appellant Harry Theodore Levine appeals his convictions for two counts of theft of $30,000 or more but less than $150,000; one count of theft of $2,500 or more but less than $30,000; possession of less than one gram of methamphetamine; and possession of a tire-deflation device.[1] *See* Tex. Penal Code Ann. §§ 31.03, 46.05; Tex. Health & Safety Code Ann. § 481.115. In three issues, Levine argues that the trial court erred by failing to give an accomplice-witness instruction, that his trial counsel rendered ineffective assistance, and that the Count Four (possession) judgment contains multiple errors. Because we conclude that Levine was not egregiously harmed by the trial court's error in failing to give an accomplice-witness instruction and that he did not show both deficient performance and prejudice for his ineffective-assistance arguments, we affirm the judgments in Counts One, Two, Three, and Six.[2] But because we hold that the restitution ordered to the theft victims was incorrectly ordered in the possession judgment, we modify the judgment in Count Four to delete the restitution to the theft victims, leaving only the restitution of $180 to the Texas Department of Public Safety (DPS), and affirm the judgment in Count Four as modified.

---

[1]According to the record, tire-deflation devices are homemade devices with nails or screws that stick out; such devices are generally thrown out of a car during a police chase to cause the police to stop.

[2]The State abandoned Count Five of the indictment.

## II. Background

The most significant piece of evidence in this case is a dash-cam video that was retrieved from a non-police GMC Yukon. It is unknown who installed the camera in the Yukon, but the Yukon (which was connected to Levine) was parked at the storage facility when police arrived after tracking a stolen skid steer, truck, and trailer to that facility. The narration from the video (which does not show the Yukon's occupants), as well as testimony from the theft victims and the accomplice witnesses, shows how the thefts occurred.

### A.    Testimony from the Theft Victims

William Ray Lee, who owns a metal fabricating business in Keene, testified that one day in the summer of 2022, his employees were unable to locate a Ford F450 truck owned by the business. Security cameras from Lee's business showed that the truck and a twenty-eight-foot gooseneck trailer were driven off the property at approximately 3:30 a.m. on June 8, 2022. The GPS on the truck showed that it had been taken to a storage facility in Acton.[3] Lee estimated that at the time they went

---

[3]Some of the witnesses used the more precise location of Acton, while others generally referred to the storage facility's location as Granbury. Acton is a small unincorporated community located approximately seven miles due east of Granbury. *See* https://en.wikipedia.org/wiki/Acton,_Texas (last visited Oct. 10, 2024). *See generally Butts Retail, Inc. v. Diversifoods, Inc.*, 840 S.W.2d 770, 774 (Tex. App.—Beaumont 1992, writ denied) ("The Court may take judicial notice of the location of cities . . . because geographical facts such as these are easily ascertainable and capable of verifiable certainty.").

missing, the truck was worth $50,000, and the trailer was worth $12,000 to $15,000. The items were returned to Lee, but the trailer was damaged and cost $958 to repair.

Rodrigo Barrera Jr., an excavation contractor, testified that he used skid steers[4] in his line of work. He said that a John Deere skid steer that he had purchased at the beginning of 2022 for $100,000 was stolen on June 8, 2022—the same date as the truck and trailer. After calling his John Deere sales representative to track the GPS link on the skid steer, Barrera learned that it was initially pinging (giving its location every forty-five minutes to an hour) from a RaceTrac gas station in Granbury and later pinged from a storage facility in Acton. The police located the skid steer and called Barrera to come retrieve it. Barrera testified that he had spent $80 to $100 to upgrade the GPS to obtain more timely pinging information (every five minutes).

## B. Accomplice-Witness Testimony

### 1. The Main Actor

Jonathan Smith, who at the time of the trial was incarcerated on two convictions for theft over $30,000 and under $150,000, admitted that he had stolen the truck, trailer, and skid steer.[5] He said that the idea of stealing the truck and trailer came to him while he was staying with a woman named Wanda; no one asked or told

---

[4]Barrera explained that a skid steer is also called a track loader because it has a loader in the front that can pick up materials. The witnesses sometimes referred to it as a tractor.

[5]Smith explained that he was also charged with theft of the skid steer and with organized crime but that those counts were waived in exchange for his guilty plea to the two counts of theft over $30,000 but less than $150,000.

4

him to steal the vehicles. Smith claimed that he was the sole person involved in the planning and the execution of the thefts and that Wanda did not know of his plan to steal the truck and trailer. Smith testified that after he picked up the skid steer, he stopped at RaceTrac to adjust it because it was sliding off the trailer. He then drove to a storage facility in Granbury where he planned to drop off the skid steer. Smith said that he was going to see if anyone at the storage facility wanted to buy the tractor because he had heard about "them buying stuff."[6] Smith testified that when he arrived, the owners of the storage facility opened the gate, he pulled in, unloaded the tractor, pulled it into one of the storage units, and was arrested. Smith claimed that there were three males standing at the storage facility, but he said that he did not know their names and had not spoken to them. He testified that Wanda was not at the storage facility.

### 2. The Gas Supplier

Keith Michael Harless—who was incarcerated for possession of methamphetamine and for multiple theft convictions related to the vehicles at issue that were stolen—testified that Appellant Levine was a friend and had initially called him seeking help with stealing the items, but Harless told Levine that he wanted nothing to do with that. Levine later enlisted Smith's help, and Harless understood that Smith was to take the truck to Levine and Wanda.

---

[6]Smith said that Wanda had pointed him to the storage facility as a place he could possibly sell the items but that she had "nothing else to do with it."

Harless testified that while he was in Dallas at a motel on the day of the thefts, he received a call from Levine to meet someone at an address and give the person gas money for a truck. Harless dropped what he was doing and went to put gas in the Ford F450 truck that was driven by Smith. Levine then asked Harless to follow the truck to Granbury to the storage facility, and Harless did so.

When they arrived, Levine opened the gate with a remote. Harless said that Levine and Wanda were there in a Yukon. Levine asked Harless to take a picture of the truck and trailer and send it to his phone.

Levine asked for some candy because his blood sugar was low, so Harless got him some candy. Harless then stood and waited. He said that he had no idea what was going on and was waiting to be reimbursed for his gas expenses when the police showed up.

**C.     The Yukon's Dash-Cam Video**

Detective Braden Bozer testified about the dash-cam video that was retrieved from the Yukon. Because Levine never showed himself or verbally identified himself on the dash-cam video, Detective Bozer had Officer Seth Richey (who was familiar with Levine's voice due to questioning him at the scene) verify that the male voice on the dash-cam video was Levine's. Detective Bozer testified that Wanda was the female voice on the video.

From the video, it is clear that the Yukon is at a storage facility that has large open bays for vehicles. During the lengthy wait for the truck, trailer, and skid steer to

6

arrive, Levine and Wanda stayed in the Yukon, conversed, and also participated in various phone calls.

During one call, Levine asked what the problem was and told the person on the call that the vehicles could be inspected for any issues upon arrival at the storage facility. The person on the phone responded, "We had to pull over, Harry."[7]

During the video, Levine said, "I've been doing this since 3:30 this morning. Actually, I've been doing this since yesterday and the day before." Levine later said, "Well, in eight minutes this piece of equipment should be here." Detective Bozer testified that Levine's statement in the dash-cam video—regarding Levine's having been "doing this since 3:30 this morning"—matched up with the time that the Ford F450 and the gooseneck trailer were stolen from Lee.

Also during the video, a lady on the phone with Wanda mentioned the gate at the storage facility, and Wanda said, "We're going to open the gate for you. We're going to; we're doing it now."

While they were waiting, Levine said, "I need some sugar; I need a snack pretty bad."[8]

Once the items arrived at the storage facility, Levine apparently video messaged a woman whom he referred to as "Baby" and made the following comments:

_____

[7]Harry is Levine's first name.

[8]Detective Bozer said that Levine made comments during book-in that he was diabetic and needed some water and sugar.

7

- "See it through the window.  See the trailer.  See the equipment on it";

- "That's gonna get us 10,000 -- $14,000 right there, to split up. . . .  That's the truck and the trailer";  and

- "Now we got a delivery to get paid. . . .  All I know is that I got to take care of this. . . .  I gotta get paid."

After the items arrived, Wanda replied, "I'm so happy we finally got our shit."

As the video was played for the jury, Detective Bozer was questioned about statements that were made in the video:[9]

Q.  That's Harry talking, right?

A.  Yes.

Q.  No cops, no shit, no nothing, right?  What he's talking about?

A.  The transaction's all set up.  It's safe that they're in a closed storage unit that has a gate.

Q.  He's talking about this theft that they're doing, right?  And orchestrating it, right?

A.  Yes.

Q.  He said something, I've got the key fob to let you in the door when you get here.  Did you hear that?

A.  Yes.

---

[9]Although the specific portion of the video is not identified in the questioning, we were able to locate the statements on the video.

## D. Testimony from Other Officers

Officer Jeremy Rebstock testified that he responded to a call about a stolen skid steer. The skid steer, which was equipped with GPS, first pinged at a RaceTrac gas station and later at a storage facility. When Officer Rebstock arrived at the storage facility, he saw a white Ford F450 and a gooseneck trailer backed into a storage bay, and four people—Zavitz,[10] Smith, Levine, and Harless—were nearby a skid steer. Officer Rebstock spoke solely with Smith who had been unloading the skid steer and who said that he did not know that the skid steer was stolen. Smith informed Officer Rebstock that a friend had called him from a private number and had told him to pick up the truck, trailer, and skid steer at a place in Burleson; Smith said that he had no contact information for his friend. Smith told Officer Rebstock that none of the other people in the storage bay were involved; Smith said, "[Y]ou got your suspect."

After Officer Rebstock assisted another officer with searching Harless's Toyota Camry, he returned to Smith who said that he had not been completely honest. Smith confessed that he had stolen the truck and trailer from Lee Products in Keene and that he had then picked up the skid steer and had brought it to the storage facility.

Officer Richey testified that he had assisted Officer Rebstock with the investigation into the stolen skid steer. When he arrived at the storage facility, he found multiple individuals inside the storage bay: Harless was standing on the right

---

[10]Zavitz's first name is never mentioned, and it was unclear to the officers whether Zavitz's father was the owner of the storage facility on the date in question.

9

side of the bay, Levine was sitting on the edge of the trailer utilizing his cell phone, and Smith was driving the skid steer. Officer Richey said that Zavitz was also in the storage bay and that he had a holster on him. Officer Richey dealt mostly with Levine and Harless.

Officer Richey read Levine his *Miranda* rights,[11] and he ultimately admitted that he had driven the Yukon to the storage facility and that some of his belongings were in it.[12] Additionally, a key to the Yukon was located on Levine's person. Another officer radioed Officer Richey that he had observed a methamphetamine pipe in the Yukon's center console. Levine said that he knew that the pipe was there but that it did not belong to him. When Officer Richey examined the pipe, he found a usable amount of methamphetamine inside the pipe. Officers also found various other items in the vehicle:

- additional methamphetamine;[13]

- a wallet belonging to Anthony Cocker;[14]

- a backpack (in the back seat directly behind the front passenger seat) that contained a loaded Sig Sauer .45 pistol, multiple loaded ammunition

---

[11]*Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966).

[12]A search of the Yukon revealed documents with Levine's name, but the title owner of the vehicle was not Levine.

[13]The weight was less than one gram. A chemist tested the substance and testified that it contained methamphetamine.

[14] The record does not reveal who this is or why his wallet was in the Yukon.

magazines, handcuffs, and a key ring with keys that appeared to go to heavy equipment;

- a container with some needles, some blood-sugar meters, and a lot of medications, but the names had rubbed off;

- a fraudulent Texas buyer tag;[15] and

- a tin can and a bigger box—both containing tire-deflation devices.

Officer Richey questioned Harless who said that he had come to help unload the skid steer. Harless admitted knowing that the truck, trailer, and skid steer had been stolen.

Sergeant Dustin Causey testified that he had arrived at the storage facility around the same time as Officers Richey and Rebstock. Once they were allowed access through the gate, they saw a Ford truck with a trailer attached in a very large storage unit and heard a piece of machinery running. He saw a blue Chevrolet car with two females—one was around twenty to thirty years old and the other was much older. As Sergeant Causey approached, he ran the license plate and learned that the vehicle was registered to Wanda Jean Hardwick Ekon. He spoke with the two females, who said that they had no affiliation with the Ford F450; he told them to leave the area for safety reasons because the other officers were making contact with four males in the storage unit and had removed a firearm from one of the men.

---

[15]Officer Richey explained that buyer tags are "the paper tags you see on vehicles." He said that fraudulent buyer tags are often associated with illegal dealings; when they are placed on vehicles, they "make it difficult to track those vehicles as far as . . . who the registered owner is because it covers up the actual plate."

11

### E.    Post-Judgment Proceedings

After the jury found Levine guilty and made sentencing recommendations and the trial court sentenced him, his appellate counsel filed a timely motion for new trial arguing generally that "[t]he verdict in this cause is contrary to the law and the evidence" and that "[t]he trial court has the discretion to grant a new trial in the interests of justice." At the hearing on the motion, Levine claimed, among other things, that his trial attorney did not follow his instructions, that he was not read his *Miranda* rights, that there was no corroboration for Smith's testimony, and that he wanted a suppression hearing because they had only half of the conversation he had with his wife.[16] After hearing Levine's testimony and testimony from his trial counsel explaining the reasoning behind his decisions, the trial court denied the motion for new trial.

This appeal followed.

## III. Accomplice-Witness Instruction

In his first issue, Levine argues that he was egregiously harmed by the trial court's failure to give an accomplice-witness instruction in his theft cases that informed the jury that there had to be non-accomplice, corroborating evidence that tended to connect Levine to the thefts. Although it was error for the trial court not to

---

[16]No recordings were played at trial other than the dash-cam video and the video from Lee's security camera. Levine appears to be referencing the portion of the dash-cam video when he was talking to "Baby." Levine, thus, implicitly concedes that it is his voice on the dash-cam video.

give an accomplice-witness instruction in Levine's theft cases, as explained below, based on the strength of the corroborating evidence, the omission of the instruction did not cause Levine egregious harm.

## A.   Error Analysis

The Houston Fourteenth Court of Appeals recently explained when an accomplice-witness instruction is mandated:

> "A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense."  Tex. Code Crim. Proc. Ann. art. 38.14.  Therefore, if an accomplice to the offense testifies for the State, such testimony must be corroborated by non-accomplice evidence that tends to "connect the accused to the offense." *State v. Ambrose*, 487 S.W.3d 587, 593 (Tex. Crim. App. 2016); *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011).  Corroborating evidence may be either direct or circumstantial. *Ambrose*, 487 S.W.3d at 593.
>
> An accomplice is one who participates in an offense, before, during, or after its commission, to the extent that she can be charged with the offense or with a lesser-included offense. *Herron v. State*, 86 S.W.3d 621, 631 (Tex. Crim. App. 2002) . . . .  A prosecution witness who is indicted for the same offense with which the defendant is charged is an accomplice as a matter of law. *Id.*  If a prosecution witness is an accomplice as a matter of law, the trial court must instruct the jury accordingly, and failure to do so is error. *Id.*

*Esparza v. State*, No. 14-22-00572-CR, 2024 WL 2364394, at *4 (Tex. App.—Houston [14th Dist.] May 23, 2024, pet. ref'd) (mem. op., not designated for publication).

Here, Levine was indicted for, among other things, two counts of theft of $30,000 or more but less than $150,000, and the State concedes that both Smith and Harless were incarcerated after pleading guilty to theft of the same property for which

13

Levine was on trial.[17]  Thus, Smith and Harless were accomplices as a matter of law, and the trial court's failure to instruct the jury to that effect was error.  *See id.*

## B.    Harm Analysis

Next, we must determine whether the trial court's error was harmful.  When a rule or statute requires an instruction under the particular circumstances of the case, that instruction is "the law applicable to the case," and we review its unobjected-to omission from the charge for egregious harm under *Almanza*.  *Oursbourn v. State*, 259 S.W.3d 159, 180 (Tex. Crim. App. 2008); *Almanza v. State*, 686 S.W.2d 157, 171–74 (Tex. Crim. App. 1985) (op. on reh'g).  In making an egregious-harm determination, we must consider "the actual degree of harm . . . in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel[,] and any other relevant information revealed by the record of the trial as a whole."  *Almanza*, 686 S.W.2d at 171.  *See generally Gelinas v. State*, 398

---

[17]The jury charge included the following instructions on the law of parties:

A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both.

Each party to an offense may be charged with the commission of the offense.

A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.

Mere presence alone will not constitute one a party to an offense.

14

S.W.3d 703, 708–10 (Tex. Crim. App. 2013) (applying *Almanza*). Errors that result in egregious harm are those "that affect the very basis of the case, deprive the defendant of a valuable right, vitally affect the defensive theory, or make a case for conviction clearly and significantly more persuasive." *Taylor*, 332 S.W.3d at 490 (citing *Almanza*, 686 S.W.2d at 172). The purpose of this review is to illuminate the actual, not just theoretical, harm to the accused. *Almanza*, 686 S.W.2d at 174.

"Under the egregious harm standard, the omission of an accomplice[-]witness instruction is generally harmless unless the corroborating (non-accomplice) evidence is 'so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive.'" *Herron*, 86 S.W.3d at 632 (quoting *Saunders v. State*, 817 S.W.2d 688, 692 (Tex. Crim. App. 1991)). *Esparza* went on to explain how to evaluate corroborating evidence:

> To determine the strength of corroborating evidence, we examine (1) its reliability or believability, and (2) the degree to which it tends to connect the defendant to the offense. *Herron*, 86 S.W.3d at 632; *see also Casanova v. State*, 383 S.W.3d 530, 539 (Tex. Crim. App. 2012). "Corroborating evidence that is exceedingly weak—that is to say, evidence that, while it is legally sufficient to tend to connect, is nevertheless inherently unreliable, unbelievable, or dependent upon inferences from evidentiary fact to ultimate fact that a jury might readily reject—may call for a conclusion that the failure to give the accomplice-witness instruction resulted in harm regardless of whether the deficiency was objected to." *Casanova*, 383 S.W.3d at 539.

2024 WL 2364394, at *5.

Here, the non-accomplice evidence—in the form of the dash-cam video from the Yukon—was both reliable and believable and directly connected Levine to the

15

thefts. Because the dash-cam video was played for the jury, they were able to hear from Levine about his role in the thefts—from planning the theft of the truck, trailer, and skid steer during the days preceding June 8, 2022; to having the stolen items brought to the storage facility in Acton; to opening the gate for the stolen truck, trailer, and skid steer to enter the storage facility; to planning the sale of the stolen items. He had his hand in every step of the process. And when the police arrived, he was sitting on the edge of the trailer.[18]

Moreover, to the extent that Levine challenges his connection to the Yukon, he admitted to Officer Richey that he had driven the Yukon, and the key to the Yukon was found on his person. Plus, inside the Yukon were documents with Levine's name and other items—such as a fraudulent buyer tag and tire-deflation devices—that could come in handy when perpetrating vehicle thefts, though they were not used during the commission of the charged offenses.

The non-accomplice evidence "tending to connect [Levine] to [the thefts] was far from insubstantial." *See Casanova*, 383 S.W.3d at 540. Having reviewed the entire record in this case, we conclude that the corroborating evidence presented by the State is not so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive. *See id.*; *Herron*, 86 S.W.3d at 632; *Esparza*, 2024

---

[18]The cases that Levine relies on in his brief are distinguishable because they rely on accomplice-witness testimony and do not have the benefit of the non-accomplice witness evidence that is present here—a dash-cam video detailing Levine's involvement in the thefts.

WL 2364394, at *6. Thus, we hold that Levine was not egregiously harmed by the trial court's failure to include an accomplice-witness instruction in the theft charges. *See Valdez v. State*, No. AP-77,042, 2018 WL 3046403, at *22 (Tex. Crim. App. June 20, 2018) (not designated for publication) (holding that appellant did not show that the failure to include an accomplice-witness instruction egregiously harmed him when the State pointed to evidence from other sources that corroborated accomplice's testimony); *Esparza*, 2024 WL 2364394, at *6 (concluding that appellant did not suffer egregious harm from the lack of an accomplice-witness instruction because the State's corroborating evidence, which included videos of appellant's involvement in the crime, was not so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive); *Johnson v. State*, No. 06-23-00081-CR, 2024 WL 351429, at *7–8 (Tex. App.—Texarkana Jan. 31, 2024, pet. ref'd) (mem. op., not designated for publication) (same).

Accordingly, we overrule Levine's first issue.

### IV. Ineffective Assistance of Counsel

In his second issue, Levine argues that his trial counsel was ineffective for failing to (1) request an accomplice-witness jury instruction for the theft cases when the witnesses were accomplices as a matter of law, (2) make a proper objection to prevent the admission of State's Exhibit 4—the Yukon dash-cam video, (3) object to speculation as to the officer's interpretation of the statements made on the dash-cam video, and (4) object to the State's violation of Texas Code of Criminal Procedure

Article 38.22. Levine argues that his trial counsel's errors prejudiced his case and caused him harm. After reviewing each of his arguments in turn, as discussed below, we conclude that Levine has not shown both deficient performance and prejudice for any of his ineffective-assistance arguments.

### A.    Standard of Review

The Sixth Amendment guarantees a criminal defendant the effective assistance of counsel. *Ex parte Scott*, 541 S.W.3d 104, 114 (Tex. Crim. App. 2017); *see* U.S. Const. amend. VI. To establish ineffective assistance, an appellant must prove by a preponderance of the evidence that his counsel's representation was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Nava v. State*, 415 S.W.3d 289, 307 (Tex. Crim. App. 2013). The record must affirmatively demonstrate that the claim has merit. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

In evaluating counsel's effectiveness under the deficient-performance prong, we review the totality of the representation and the particular circumstances of the case to determine whether counsel provided reasonable assistance under all the circumstances and prevailing professional norms at the time of the alleged error. *See* *Strickland*, 466 U.S. at 688–89, 104 S. Ct. at 2065; *Nava*, 415 S.W.3d at 307; *Thompson*, 9 S.W.3d at 813–14. Our review of counsel's representation is highly deferential, and we indulge a strong presumption that counsel's conduct was not deficient. *Nava*, 415 S.W.3d at 307–08.

An appellate court may not infer ineffective assistance simply from an unclear record or a record that does not show why counsel failed to do something. *Menefield v. State*, 363 S.W.3d 591, 593 (Tex. Crim. App. 2012); *Mata v. State*, 226 S.W.3d 425, 432 (Tex. Crim. App. 2007). Trial counsel "should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective." *Menefield*, 363 S.W.3d at 593. If trial counsel did not have that opportunity, we should not conclude that counsel performed deficiently unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Nava*, 415 S.W.3d at 308. Direct appeal is usually inadequate for raising an ineffective-assistance-of-counsel claim because the record generally does not show counsel's reasons for any alleged deficient performance. *See Menefield*, 363 S.W.3d at 592–93; *Thompson*, 9 S.W.3d at 813–14.

*Strickland*'s prejudice prong requires a showing that counsel's errors were so serious that they deprived the defendant of a fair trial—that is, a trial with a reliable result. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. In other words, an appellant must show a reasonable probability that the proceeding would have turned out differently without the deficient performance. *Id.* at 694, 104 S. Ct. at 2068; *Nava*, 415 S.W.3d at 308. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068; *Nava*, 415 S.W.3d at 308. We must ultimately focus on examining the fundamental fairness of the proceeding in which the result is being challenged. *Strickland*, 466 U.S. at 696, 104 S. Ct. at 2069. "[A] verdict or conclusion only weakly supported by the record is

more likely to have been affected by errors than one with overwhelming record support." *Id.*, 104 S. Ct. at 2069.

## B. Analysis[19]

### 1. Failure to Request an Accomplice-Witness Instruction

Levine begins by stating that "[e]ven if this [c]ourt finds [that] the trial court's failure to give the [accomplice-witness] instruction did not cause [Levine] egregious harm, this [c]ourt should find [that] trial counsel's failure to request the instruction constituted deficient performance under the first prong of *Strickland*." Even if we were to assume that trial counsel's failure to request an accomplice-witness instruction constituted deficient performance,[20] such failure did not prejudice Levine because (1) there was a substantial amount of non-accomplice evidence—the dash-cam video,

---

[19]In her briefing before this court, Levine's appellate counsel noted that she had participated in a hearing on Levine's motion for new trial based on his claims of error but that she was not able to examine the trial records before the hearing because they were not available. Consequently, Levine's appellate counsel claims that she "[had] to rely solely on [Levine's] perception of his trial counsel's errors" and was therefore constrained because he did not know that the State had violated his rights under Article 38.22, that his trial counsel had failed to properly challenge the admission of the dash-cam video, and that his trial counsel should have requested an accomplice-witness instruction on his behalf.

[20]As the State points out, given that Smith had taken full responsibility for the thefts, Levine's trial counsel could have made a strategic decision not to request an accomplice-witness instruction to distance Levine from the term "accomplice" and to avoid subjecting Smith's testimony to additional scrutiny from the jury. *See Sabatini v. State*, No. 14-20-00066-CR, 2020 WL 7866724, at *7 (Tex. App.—Houston [14th Dist.] Dec. 31, 2020, no pet.) (mem. op., not designated for publication) ("In the absence of direct evidence of counsel's reasons for the challenged conduct, an appellate court will assume a strategic motivation if any can be imagined.").

the key to the Yukon was on Levine's person, and the items in the Yukon were connected to Levine—that demonstrated Levine's role in the thefts and (2) the record does not reveal any rational basis on which the jury could have doubted or disregarded that evidence. *See Davis v. State*, 278 S.W.3d 346, 352 (Tex. Crim. App. 2009) (holding that trial counsel's failure to request an instruction on accomplice-witness testimony constituted deficient performance but that appellant did not meet the second prong of *Strickland*). Because Levine also challenges his trial counsel's alleged failures that resulted in the admission of the dash-cam video, we turn our focus to address those complaints.

### 2. Failing to Object to Authentication of Dash-Cam Video

Levine contends that his trial counsel was deficient for failing to object to the admission of the dash-cam video based on authentication, instead of hearsay, because the proponent of the video (Detective Bozer) could not identify the voices on the recording. Levine's argument ignores that Officer Richey was familiar with Levine's voice, that Detective Bozer asked Officer Richey to verify that the voice on the dash-cam video was Levine's, and that Officer Richey did so.[21] Levine further ignores that Texas Rule of Evidence 901, which he relies on, includes the following example of evidence that satisfies the authentication requirement: "*Opinion About a Voice.* An

---

[21]Moreover, although Officer Richey was available to testify (and did testify after Detective Bozer), Levine's trial counsel may not have wanted to waste the jury's time by calling him to contest the authenticity of the dash-cam video because it was clear from the record that Officer Richey had been the main officer who had questioned Levine on the day of his arrest and was therefore familiar with his voice.

21

opinion identifying a person's voice—whether heard firsthand or through mechanical or electronic transmission or recording—based on hearing the voice at any time under circumstances that connect it with the alleged speaker." *See* Tex. R. Evid. 901(b)(5); *cf. Knight v. State*, No. 08-16-00123-CR, 2018 WL 3867570, at *5–6 (Tex. App.—El Paso Aug. 15, 2018, no pet.) (not designated for publication) (stating that the person making the identification of the caller need not be the recipient of the call, and may instead be a third party, such as a police officer, who has simply listened to a recording of the call and is able to identify the voice due to his familiarity with it); *Diamond v. State*, 496 S.W.3d 124, 142 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd) (holding authentication of jail phone calls proper, in part, because officer interviewed defendant after his arrest and testified that he recognized defendant's voice as the voice on the phone calls). Because Levine's voice was identified, we conclude that his trial counsel was not deficient for failing to object to the dash-cam video's authentication.

### 3. Failing to Make a Speculation Objection to Testimony About Statements in the Dash-Cam Video

Levine further argues that his trial counsel was deficient for failing to assert a speculation objection when the State asked Detective Bozer to explain statements that Levine made while the dash-cam video was recording. Specifically, Levine points to the following portion of the State's questioning which was also set out above:

Q. That's Harry talking, right?

A. Yes.

Q. No cops, no shit, no nothing, right? What he's talking about?

A. The transaction's all set up. It's safe that they're in a closed storage unit that has a gate.

Q. He's talking about this theft that they're doing, right? And orchestrating it, right?

A. Yes.

Levine contends that "[b]ecause [his] trial counsel did not object to this interchange, the State bolstered its theory that [Levine] was the 'mastermind' of this crime." Assuming without deciding that trial counsel's failure to raise a speculation objection to this portion of Detective Bozer's testimony constituted deficient performance, we conclude that such failure did not prejudice Levine because many of his other statements in the dash-cam video demonstrated that he was the mastermind, including the following:

- "I've been doing this since 3:30 this morning. Actually, I've been doing this since yesterday and the day before";

- "Well, in eight minutes this piece of equipment should be here";

- "That's gonna get us 10,000 -- $14,000 right there, to split up. . . . That's the truck and the trailer"; and

- "Now we got a delivery to get paid. . . . All I know is that I got to take care of this. . . . I gotta get paid."

### 4.    Failing to Make an Article 38.22 Objection

Levine concludes his ineffective-assistance issue by arguing that his trial counsel was deficient for failing to object to the introduction of his statements to the police because they were allegedly taken in violation of Article 38.22.[22] Levine points to the following statements made by law enforcement (Officer Richey) regarding Levine's custodial statements to which his trial counsel made no objection:

- So once we believed there was probable cause to effect an arrest, it was a search incident to arrest of Mr. Levine[,] and that's whenever a key was located on his person as well as he admitted

---

[22]Article 38.22 governs the admissibility of statements made by a defendant during custodial interrogation in a criminal proceeding. Tex. Code Crim. Proc. Ann. art. 38.22. Among other things, Article 38.22 provides that an oral custodial statement is inadmissible unless

(1) an electronic recording, which may include motion picture, video tape, or other visual recording, is made of the statement;

(2) prior to the statement but during the recording the accused is given the [statutory] warning[,] . . . and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warning;

(3) the recording device was capable of making an accurate recording, the operator was competent, and the recording is accurate and has not been altered;

(4) all voices on the recording are identified; and

(5) not later than the 20th day before the date of the proceeding, the attorney representing the defendant is provided with a true, complete, and accurate copy of all recordings of the defendant made under this article.

*Id.* art. 38.22, § 3(a).

24

to me under [*Miranda*] that he drove the vehicle there and that he was currently homeless and several of his belongings were inside the vehicle.

- First go round he told me a friend dropped him off.

- It wasn't until later when I was talking to him that he told me he did end up driving the vehicle there.

- I ask[ed] Mr. Levine about the pipe[,] and he told me that he knew it was in there but [that] it did not belong to him.

- So when Officer Miller told me that he saw [the pipe], that's whenever I asked Mr. Levine. . . . And Mr. Levine was basically telling me [that] he knew it was there[,] and he was telling me that he was driving the vehicle[,] but he also told me that the pipe did not belong to him.

Levine argues that such statements were inadmissible at trial because "[t]here was no video of [his] arrest, his *Miranda* warning, his voluntary waiver, or . . . his custodial statements."[23] Levine contends that "[t]here could be no rational trial strategy in failing to protect [his] constitutional rights and [his] rights under Article 38.22."

The record reflects that Levine's trial counsel filed a motion to compel the production of any video or audio recordings made by the police and argued in the motion, as well as at the hearing on the motion, that the case should be dismissed if such recordings could not be produced. Moreover, it is possible that Levine's trial counsel chose not to object on Article 38.22 grounds because although Officer

---

[23]At a pretrial hearing, it was brought to the trial court's attention that the patrol-car videos were corrupted, that the police attempted to have the videos uncorrupted, and that the files that were returned were unable "to be put back together where you can watch from start to finish."

Richey's testimony repeated Levine's admission that he had driven the Yukon, other evidence (including the Yukon's key on Levine's person) had already connected him to the Yukon; but Officer Richey's testimony simultaneously brought forward Levine's statement that the methamphetamine pipe was not his without having to subject Levine to cross-examination. Levine's trial counsel reasonably could have determined that admission of Levine's statements to Officer Richey would not likely have changed the outcome of the theft cases and that asserting an Article 38.22 objection could have damaged Levine's defense in the possession case. But even assuming that Levine's trial counsel was deficient for failing to object to his statements to police,[24] Levine has not shown a reasonable probability that the proceeding would have turned out differently without the deficient performance in light of all the evidence connecting the Yukon and its contents to Levine. *See Runnels v. State*, No. 05-22-01349-CR, 2024 WL 618061, at *4 (Tex. App.—Feb. 14, 2024, no pet.) (mem. op., not designated for publication) (holding that although trial counsel did not make an Article 38.22 objection, appellant failed to rebut the strong presumption that trial counsel's performance fell within the wide range of reasonable professional assistance); *Miranda v. State*, Nos. 07-17-00327-CR, 07-17-00328-CR, 2019 WL 5280980, at *6 (Tex. App.—Amarillo Oct. 17, 2019, no pet.) (mem. op., not designated for publication) (holding that trial counsel did not render ineffective

[24]At the hearing on the motion for new trial, when Levine's trial counsel was asked about the alleged custodial statements, his recollection was that "the State did not attempt to admit any of [Levine's] statements made after his arrest."

26

assistance by failing to object to the admission of appellant's statement to police); *Aldaba v. State*, 382 S.W.3d 424, 432–33 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd) ("Because, on this record, the trial outcome was not likely to have turned on the admission of appellant's statements, his trial counsel's failure to procure a ruling or object on [A]rticle 38.22 grounds could not constitute ineffective assistance of counsel.").

### C.      Disposition of Second Issue

Having ruled against Levine on each of his ineffective-assistance arguments, we overrule his second issue.

## V.  Challenges to the Count Four Possession Judgment

In his third issue, Levine argues that the possession judgment does not match the oral rendition, unlawfully imposes a $50 fine, and unlawfully assesses restitution for the theft convictions.  We conclude that only his restitution argument has merit.

### A.      Community Supervision and Imposition of Fine

Levine argues that the Count Four written judgment conflicts with the oral pronouncement.  To create the conflict, Levine sets forth the portion of the record when the trial court read aloud the jury's sentencing recommendation instead of the portion of the record when the trial court officially sentenced Levine.  Because the written judgment matches the trial court's oral pronouncement of sentence—

suspending the sentence of confinement and placing Levine on four years' community

supervision—we overrule this portion of Levine's third issue.[25]

Levine also argues that the possession judgment included standard community-supervision conditions that are inapplicable in a judgment of confinement. Specifically, Levine contends that the possession judgment unlawfully assessed a $50 Crime Stoppers fine even though he was not placed on community supervision. Because we have held that the trial court placed Levine on community supervision, such fine is proper as a condition of community supervision. *See generally* Tex. Code Crim. Proc. Ann. art. 42A.301(b)(19) (stating that conditions of community supervision may include a condition requiring the defendant to pay a fine in an amount not to exceed $50 to a crime stoppers organization). We therefore overrule the portion of Levine's third issue challenging the $50 Crime Stoppers fine.

### B.    Restitution

In the final portion of his third issue, Levine argues that the possession judgment unlawfully assessed restitution for the thefts from Lee and Barrera.[26]

---

[25]Levine did not mention, much less brief, any issue related to Texas Code of Criminal Procedure Article 42A.551. *See generally* Tex. R. App. P. 38.1(i) (requiring brief to provide "a clear and concise argument for the contentions made, with appropriate citations to authorities"); *Cardenas v. State*, 30 S.W.3d 384, 393 (Tex. Crim. App. 2000) (holding that an appellant waives an issue on appeal if he does not adequately brief that issue, i.e., by presenting supporting arguments and authorities).

[26]Following the mention of restitution during the pronouncement of sentence, Levine's trial counsel questioned the trial court regarding whether restitution for the thefts would be collectible under Count Four (the possession count), and the trial

Although the trial court ordered Levine to pay restitution of $958 to Lee, $100 to Barrera, and $180 to DPS, he concedes that the restitution to DPS "for drug testing is a legitimate fee" and thus challenges only the restitution to Lee and Barrera.

The Texas Code of Criminal Procedure provides that "[i]n addition to any fine authorized by law, the court that sentences a defendant convicted of an offense may order the defendant to make restitution to any victim of *the* offense." *Id.* art. 42.037(a) (emphasis added). The offense at issue in Count Four was possession of methamphetamine, and no victim was mentioned in relation to this offense. The restitution to Lee and Barrera in the Count Four judgment, however, corresponded to their status as victims of the theft offenses that were set forth in other counts. The possession judgment's restitution to Lee and Barrera therefore cannot stand because it does not relate to "the offense"—possession of methamphetamine—underlying that judgment. *See generally id.* art. 42.037(a). Accordingly, we sustain the final portion of Levine's third issue challenging the possession judgment's restitution to Lee and Barrera.

## VI. Conclusion

Having sustained the portion of Levine's third issue challenging the possession judgment's restitution to Lee and Barrera, we modify the Count Four judgment to

court responded, "Yes, sir. If you disagree with that[,] you can appeal that decision, but I am going to make that a condition of supervision that those people be compensated for their injury." We therefore conclude that Levine preserved this issue for appeal.

29

delete the restitution of $958 to Lee and the restitution of $100 to Barrera, leaving only the restitution of $180 owed to DPS;[27] as modified, we affirm the Count Four judgment. Having overruled the remaining portions of Levine's third issue, as well as his first and second issues, we affirm the trial court's judgments in Counts One, Two, Three, and Six.

/s/ Dabney Bassel

Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: October 17, 2024

---

[27]The State in its brief requests that we "order $958.00 restitution to William Ray Lee for the conviction stemming from Count 1 of the indictment and $100.00 restitution to Rodrigo Barrera Jr. for the conviction stemming from Count 2 of the indictment." Because the trial court did not pronounce such restitution as part of the punishment for Counts One and Two, we cannot alter the written judgments on those counts to add restitution. *See generally Piazza v. State*, No. 09-22-00029-CR, 2022 WL 16954846, at *2 (Tex. App.—Beaumont Nov. 16, 2022, no pet.) (mem. op., not designated for publication) ("If an order of restitution is not orally pronounced but later appears in a written judgment, the defendant may be entitled to have the restitution order deleted from the judgment.").