# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---
### NO. 03-23-00131-CR
---

**Wilbur Eugene Jackson, Appellant**

**v.**

**The State of Texas, Appellee**

---
### FROM THE 21ST DISTRICT COURT OF LEE COUNTY
### NO. 8296, THE HONORABLE CARSON TALMADGE CAMPBELL, JUDGE PRESIDING
---

## M E M O R A N D U M   O P I N I O N

Appellant Wilbur Eugene Jackson pleaded guilty pursuant to a plea bargain to theft of cattle with an aggregate value of less than $150,000, *see* Tex. Penal Code § 31.02(e)(5)(A), enhanced under the habitual-offender statute, *see id.* § 12.42(d), and was placed on deferred adjudication community supervision for 10 years, *see* Tex. Code Crim. Proc. art. 42A.101(a). The State filed an amended motion to adjudicate Jackson's guilt, alleging that he had violated the terms and conditions of his supervision. Jackson pleaded true to the allegations, and the trial court revoked his community supervision, adjudicated his guilt, and assessed his punishment at 50 years' confinement. *See id.* arts. 42A.108, .110. In a single issue, Jackson contends that trial counsel's ineffective assistance caused him to plead true and that his pleas were therefore involuntary. We affirm the trial court's judgment adjudicating Jackson's guilt.

## BACKGROUND

On February 7, 2023, Jackson signed plea documents judicially confessing to all non-abandoned allegations listed in the State's amended motion to adjudicate his guilt. The documents state that there was "[n]o plea agreement"; that Jackson was entering an "open plea to the court, provided any sentences to run concurrently"[1]; and that the case would be "[r]eset for sentencing Friday 2-10-2023 @ 9:00 AM in the Lee County District Court."

The trial court held a hearing on February 7, at which it accepted Jackson's pleas of true to the allegations. At the start of the hearing, the trial judge advised him, "I also want you to understand what happens today; so if there's something you do not understand or something you question, please stop me. I'll allow you to visit with your attorney. When you're ready to proceed, we will." Under oath, Jackson stated that he understood each of the alleged violations, that he was aware that the range of punishment for the offense was "25 to life," that he had reviewed the plea documents with his trial counsel, that counsel had explained the documents to him, and that Jackson had freely signed them. Jackson assented when asked whether "the only agreement in these documents as to punishment is that the terms would run concurrently."

Counsel agreed that Jackson was "aware of what he's doing today" and, in an exchange with the trial court, confirmed the limited scope of the State's concessions:

> THE COURT: It's my understanding that the only agreement in this matter is that the cases run concurrently; is that correct?
>
> DEFENSE COUNSEL: Yes, Your Honor.
>
> THE COURT: And that's your understanding also?

---

[1] At the time Jackson signed the plea documents, he was charged with two additional felonies that are not part of this appeal.

DEFENSE COUNSEL: Yes, Your Honor, we were – we were going to ask for – we'd spoken through in probation whereby he pays the – or deferred whereby as a condition he'll pay back some $50,000 at the rate of 3,000 a month as a condition.

THE COURT: Okay. And that's what you're seeking, though, as punishment, as I understand.

DEFENSE COUNSEL: Yes.

THE COURT: There's not an agreement as to that yet.

DEFENSE COUNSEL: Yes.

THE COURT: There's no agreement, correct?

DEFENSE COUNSEL: Correct, there's no agreement.

THE COURT: Okay. That's what I'm wondering.

The trial court admonished Jackson that he would largely lose his right to appeal if it accepted "the agreement as to running the cases concurrently." Jackson pleaded true to each of the alleged violations, and the court accepted the pleas without making findings. On the State's motion, the court admitted several exhibits for the punishment hearing. The trial judge informed Jackson that "what we'll do is have the punishment phase of this trial on Friday at 9:00 a.m., so the Court does order you to be here at 9:00 a.m. Friday." Jackson replied that he understood.

On February 9, two days after the plea hearing, trial counsel filed an amended motion to withdraw Jackson's pleas of true. In the motion, counsel explained that he and the State's attorney had met to discuss exhibits and that counsel "mistakenly believed there was a plea agreement if it were pled that day for all three cases [Jackson] has pending." Counsel stated that he "thought he understood the agreement, but he did not" and that "[b]ased on his misunderstanding, [Jackson] agreed" to plead true.

3

The trial court held a hearing on the motion on February 10, and counsel further explained the purported confusion:

> Tuesday [February 7] I met with [the State's attorney] regarding basically going over his exhibits and all that sort of thing, started to get everything taken care of . . . . During that time I brought up the possible settlement agreement whereby we're going to ask if he would agree to a probation on all three cases with the condition that [Jackson] pay back $50,000, whatever the exact amount is over the course of the probation at $3,000 a month. That would be in the nature of restitution. He also was to make a payment Friday, which he – well, this week, which he did, which was bringing his fees up on the probation.
>
> While we were discussing apparently my – I won't make any excuses. I took it to mean [the State] was going to not oppose going to the Court for sentencing. I called the Court – I called my – [the State's attorney] said get the client here today to plea. We can do the plea today, meaning Tuesday. I called my client and in discussing it, [Jackson] took it to mean we're going to get a probation coming here and so he's willing to do a plea on probation. He told – he misunderstood. I was not clear enough to him and it's my fault totally, so now we're at – now, when he realized it and it was too late to come back to that date, we got together and talked on Tuesday – Wednesday and I began researching to see what we need to do [] a withdrawal.

The State's attorney challenged counsel's explanation and noted that he had met with counsel "more than half a dozen times," that in "all of these discussions" he had been "very clear that [he] was seeking significant penitentiary time," that he had put his plea-bargain offers in writing, and that "[a]t no time did [he] agree to allow [Jackson] to have probation or not oppose a motion for probation." The State's attorney also emphasized that during the plea hearing, the trial court had repeatedly confirmed with the parties "that there was no plea bargain offer other than these sentences would run concurrently." Counsel agreed that the State had not made a promise but stated that he "thought at the last minute that possibly [the State's attorney] reversed himself." Counsel also asserted that when he told Jackson that they "were going to go

4

to the Judge and ask for probation, [Jackson] took that to mean that it was a deal. It was not his fault whatsoever."

The trial court denied counsel's motion and articulated the court's position for the record:

> I think you have tried and you are trying to create a defense of ineffective assistance of counsel so no matter what this Court does, you will have that defense to take up; so the Court will say I put very little significance in what you've represented to this Court. The plea has been accepted. We're going forward with punishment.

When counsel requested a reset, the court denied the request and again told counsel that it "put very little weight in what you have to say."

During the punishment hearing, Jackson testified about his attempt to withdraw his pleas:

Q. Now, you went – you attempted to withdraw your plea?

A. Yes, sir.

Q. Are you saying that you no longer wish to plead guilty?

A. I would have never pleaded guilty.

Q. Okay.

A. I was under the – when [counsel] called me and told me that [he] and the special prosecutor had worked out a deal, it would be that I was going to pay $2,000 today on the restitution of my probation and I was supposed to start paying $3,000 a month on this cow case and when I – when [counsel] called me Tuesday morning and [he] told me that [he] was meeting with the special prosecutor, [he] said [he] would get back with me if [they] reached an agreement. Tuesday afternoon, [counsel] called me about 2:30, almost 3:00 o'clock . . . . [He] told me that [they] had reached a deal, but it had to be[] done on Tuesday. [He] told me to get here, could I be here before 4:30.

5

I said that's probably going to be impossible[,] . . . but I would do my best. I drove like a maniac to get here under the impression that [he] told me that I was going to pay the $2,000 today on my probation and [they] had made an agreement for me to pay 3,000 a month and I was to remain on the probation until the 3 – the 50 grand or whatever [counsel] told me was paid off. When I got here, [counsel] sat there in the foyer and [he] had a stack of papers there. I did not read them.

[He] sat there and [he] told me this is what this says, this is basically what this says, this is basically what this says and then I said, okay. So what's the deal? [He] said the agreement is we're going to go ahead before the Judge. You are to say true, guilty to whatever – guilty to the charges that he asks you and I said, well, I'm not – I'm not going to say guilty to something that I didn't do. [He] told me that I had to say guilty in order for that deal to get done on Tuesday. I said, okay. Well, if that's the deal, let me go ahead and pay it out and get it over with. I'm tired of wrestling with this. If it's money that they want, I'll pay it out and take the charge.

Well, I come in here and I hear Judge Campbell . . . telling me, you know, the – what was going on and at that time I kept looking at . . . my attorney, because [he] was telling me to plead guilty to a case number of a theft and I looked at [counsel] and he was like, you know, say guilty. This is the only way we're going to get this deal done. Today I was – from what I understood, I was supposed to come here today. I was going to pay the money, sign an agreement to pay $3,000 a month up to 50,000.

Well, when Judge Campbell got through talking and when I asked [counsel] going out in the hallway I said, man, what just took place? And I was told that, well, the special prosecutor and [counsel] decided that – to take [me] before the Judge – let the Judge do a sentencing. That would be the best thing. I said no.

At that time, I tried talking to the special prosecutor. He told me, "I can't talk to you." As I approach the Judge here in the hallway, you said you couldn't talk to me. I felt like I got bamboozled. I mean, I come in here and they told me I was doing one thing and it was completely another thing.

Following the punishment hearing, the trial court found nine of the 16 allegations to be true, revoked Jackson's community supervision, adjudicated him guilty of livestock theft, and assessed his punishment at 50 years' confinement. This appeal followed.

6

**DISCUSSION**

In a single issue, Jackson contends that trial counsel "made misrepresentations to [Jackson] which amount to ineffective assistance of counsel and ultimately rendered [his] plea to be involuntary."

To establish ineffective assistance of counsel, an appellant must demonstrate by a preponderance of the evidence both deficient performance by counsel and prejudice suffered by the appellant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Miller v. State*, 548 S.W.3d 497, 499 (Tex. Crim. App. 2018). "An attorney is deficient if his performance falls below an objective standard of reasonableness under the prevailing professional norms, considering the facts of the case viewed from counsel's perspective at the time of the representation." *Ex parte Lane*, 670 S.W.3d 662, 671 (Tex. Crim. App. 2023). In making this analysis, "we must make every effort to 'eliminate the distorting effects of hindsight.'" *Id.* (quoting *Strickland*, 466 U.S. at 689). Our review of counsel's representation is highly deferential, *Nava v. State*, 415 S.W.3d 289, 307–08 (Tex. Crim. App. 2013), and there is a strong presumption that counsel's conduct was reasonable and might be considered sound trial strategy, *Hart v. State*, 667 S.W.3d 774, 781 (Tex. Crim. App. 2023); *see Strickland*, 466 U.S. at 689.

An appellant who proves deficient performance must then prove prejudice. *See Miller*, 548 S.W.3d at 499. "To have a court set aside a defendant's plea of true as involuntary based on the deficient performance of defendant's trial counsel in advising the defendant regarding the plea of true, the defendant must prove a reasonable probability that, but for trial counsel's deficient performance, the defendant would not have pleaded true." *Sykes v. State*, 586 S.W.3d 522, 530 (Tex. App.—Houston [14th Dist.] 2019, pet. ref'd) (citing *Lee v. United States*, 582 U.S. 357, 364–65 (2017); *Miller*, 548 S.W.3d at 499). Failure to prove either

deficient performance or prejudice is fatal to the ineffectiveness claim. *Perez v. State*, 310 S.W.3d 890, 893 (Tex. Crim. App. 2010).

A *Strickland* analysis often involves "subsidiary questions of historical fact, some of which may turn upon the credibility and demeanor of witnesses." *Kober v. State*, 988 S.W.2d 230, 233 (Tex. Crim. App. 1999) (citing *Strickland*, 466 U.S. at 698). Generally, we "afford almost total deference to a trial court's determination of the historical facts that the record supports especially when the trial court's fact findings are based on an evaluation of credibility and demeanor." *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997); *see Odelugo v. State*, 443 S.W.3d 131, 137 (Tex. Crim. App. 2014); *Johnson v. State*, 169 S.W.3d 223, 239 (Tex. Crim. App. 2005).

"A defendant's plea of true to the violations of the conditions of his community supervision must be voluntary." *Sykes*, 586 S.W.3d at 531. "A guilty plea is not knowing and voluntary if made as a result of ineffective assistance of counsel." *Ex parte Moussazadeh*, 361 S.W.3d 684, 689 (Tex. Crim. App. 2012). Thus, a plea "based on erroneous information conveyed to the defendant by his trial counsel is involuntary." *Sykes*, 586 S.W.3d at 531; *see Ex parte Battle*, 817 S.W.2d 81, 83 (Tex. Crim. App. 1991) ("A defendant's election to plead guilty or nolo contendere when based upon erroneous advice of counsel is not done voluntarily and knowingly."). When an appellant complains that his plea was involuntary because of the ineffective assistance of counsel, the voluntariness of the plea depends on (1) whether counsel's advice fell within the range of competence demanded of attorneys in criminal cases and if not, (2) whether there was a reasonable probability that, but for counsel's errors, the appellant would not have pleaded and would have insisted on going to trial. *Ex parte Moody*, 991 S.W.2d 856, 857–58 (Tex. Crim. App. 1999). However, "[a] record that indicates that the trial court properly

8

admonished the defendant presents a prima facie showing that the guilty plea was made voluntarily and knowingly." *Labib v. State*, 239 S.W.3d 322, 332 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (citing *Martinez v. State*, 981 S.W.2d 195, 197 (Tex. Crim. App. 1998)). "An appellant who attests when he enters his plea that he understands the nature of his plea and that it is voluntary has a heavy burden on appeal to show that his plea was involuntary." *Sykes*, 586 S.W.3d at 531.

The present case appears to be unique in that trial counsel was insistent below on the deficiency of his own performance. However, whether counsel in fact provided ineffective assistance is a mixed question of fact and law that here turns largely on his and Jackson's credibility. *See Odelugo*, 443 S.W.3d at 137; *Kober*, 988 S.W.2d at 233. In answering such a question, we afford almost total deference to the trial court's implicit finding that counsel and Jackson were not credible in relating Jackson's understanding of the concessions offered by the State in exchange for his pleas. *See Guzman*, 955 S.W.2d at 89; *Kober*, 988 S.W.2d at 233. The trial court twice asserted that it put little weight or significance on counsel's statements and explained that it believed that counsel was attempting to fabricate a claim for ineffective assistance of counsel. The court was in an appreciably better position than this Court to make that determination. *See Guzman*, 955 S.W.2d at 87.

Moreover, the record before us contradicts the conclusion that Jackson believed he would receive probation in exchange for pleading true to the alleged violations. The plea documents, which Jackson signed, recite that there was no plea agreement, that he was making an open plea, that the State's sole concession was concurrent sentencing, and that the case would be reset for a punishment hearing. Jackson certified that he understood that he faced a sentencing range of 25 years to life and swore that he "underst[oo]d the admonishments set out

in this document and [was] aware of the consequences of a plea of TRUE, including the minimum and maximum punishment provided by law." He also swore that he had "discussed this entire document fully with [his] attorney"; that his pleas were voluntary; that the documents contained "ALL of the terms of the agreement"; and that he "freely, voluntarily, and intelligently, joined by [his] attorney, agree[d] and consent[ed] to the mutual punishment recommendation of the State listed above." Trial counsel signed below an advisement that he had carefully reviewed the plea documents with Jackson, that counsel believed that Jackson understood the admonishments and was aware of the consequences of his pleas, and that Jackson was entering the pleas voluntarily and knowingly. Counsel also acknowledged, as evidenced by his signature, that "the plea bargain agreement in Section VI reflects all of the terms of the plea agreement between the State and Defendant." Neither that section nor any other referred to an offer of probation in exchange for Jackson's pleas.

The plea hearing likewise supports the conclusion that counsel did not misrepresent the consequences of Jackson's pleas to him. The trial court informed Jackson that he could stop the proceeding at any time to speak with counsel "if there's something that [Jackson did] not understand or something [he] question[ed]." Yet at no point during the hearing—in which both parties confirmed that the only agreement was for concurrent sentencing—did Jackson ask to speak with counsel or question the State's concession as characterized. While under oath, Jackson stated that he understood that the range of punishment in each of his cases was 25 years to life and that "the only agreement in these documents as to punishment is that the terms would run concurrently." He again asserted that he had reviewed the plea documents with counsel, who had explained them to him. Counsel similarly informed the court that Jackson was aware of what he was doing and that the only agreement was that the

"cases run concurrently." Indeed, the court took pains to clarify with counsel that there was no agreement regarding probation and that counsel merely intended to request probation at the punishment hearing. Jackson remained silent when counsel stated, "Correct, there's no agreement" with respect to probation. Presumably, the trial court would have noticed had Jackson, as he later testified, "kept looking at [counsel, who] . . . was like, you know, say guilty." And neither counsel nor Jackson objected to or questioned the court's admission of exhibits in preparation for a punishment hearing later in the week—an act that both should have found confusing if they believed there was an agreed sentence of probation.

Although Jackson later testified that he confronted counsel immediately on leaving the courtroom after the hearing on February 7, a Tuesday, counsel did not file his approximately one-page motion to withdraw Jackson's pleas until two days later. In his punishment-hearing testimony, Jackson contradicted his own sworn statements in the plea documents and at the plea hearing by testifying that he had not read the plea documents and that counsel had not reviewed them with or explained them to him. Accepting Jackson and counsel's explanation would, moreover, have required the trial court to discount the State attorney's assertions that he had put his offers in writing, been "very clear" about seeking "significant penitentiary time," not offered probation, and not agreed to a motion for probation. Finally, counsel himself told the court that any confusion on Jackson's part may have resulted from Jackson's mistaken assumption that "it was a deal" after counsel correctly informed him that they "were going to go to the Judge and ask for probation."

From this record, we conclude that Jackson has failed to prove by a preponderance of the evidence that counsel misrepresented the terms of the State's plea offer or that Jackson's plea was rendered involuntary owing to counsel's actions. *See Strickland*,

11

466 U.S. at 687; *Miller*, 548 S.W.3d at 499. Because we resolve this case on the deficiency prong, we do not need to address prejudice. *See Hart*, 667 S.W.3d at 781. We overrule Jackson's sole issue.

## CONCLUSION

Having overruled Jackson's only issue on appeal, we affirm the trial court's judgment adjudicating his guilt.

_____
Edward Smith, Justice

Before Justices Baker, Triana, and Smith
  Dissenting Opinion by Justice Triana

Affirmed

Filed: November 22, 2024

Do Not Publish